[No. 44145. En Banc. January 6, 1977.]

THE STATE OF WASHINGTON, *Petitioner*, v. RANDY
GORDON LUOMA, *Respondent*.

*Robert K. Leick, Prosecuting Attorney,* and *Grant E. Hansen, Deputy,* for petitioner.

*Bernard J. Heavey, Jr.,* and *Robert W. Garver, Jr.,* for respondent.

HUNTER, J.—The defendant (respondent) in this case, Randy Gordon Luoma, a 17 1/2–year–old juvenile, was convicted in Skamania County Superior Court in a jury trial for first–degree murder. Upon appeal to the Court of Appeals, Division Two, the trial court was reversed and the case was remanded for a new trial excluding the first–degree murder charge.

■ The case comes before us on the State's petition for review. We necessarily must consider all issues raised by the defendant in his appeal to the Court of Appeals.

The defendant contends that the evidence in this case is insufficient to support the jury's findings: (1) that the defendant committed the murder; and (2) that there was premeditation, the necessary element of murder in the first degree. Since the defendant challenges the sufficiency of the evidence, we must recount the facts of the case in some detail.

The defendant lived at the residence of Glenda and Rocky Emerson, in Home Valley, Skamania County. Rocky, the defendant's uncle, was the common–law husband of Glenda and the father of Glenda's 5–year–old daughter Shannon, the murder victim. Rocky had left Glenda, and defendant had continued to live with her and her daughter. Glenda and the defendant intended to marry; she was pregnant with his child at the time of the trial. Defendant cared for Shannon every day while her mother worked. On May 28, 1974, defendant and Shannon dropped Glenda at the mill where she worked at 7 a.m., then drove to a nearby mill where he inquired about work for that day without success, and returned home. At noon, defendant went to the mill and informed Glenda that Shannon was missing. Authorities were contacted, a search conducted, and late in the day Shannon's body was found face down in a marshy culvert about 5 miles from her home. A large rock was on top of her head and she was holding on to grass on the bank of the culvert. Pathologists testified that the death occurred in the late morning of May 28, 1974, and that Shannon died in the culvert of a blow to the back of the head inflicted with a flat, blunt instrument. She had cuts and bruises about the head and face, as well as on her body.

The defendant's account at trial of his activities during the morning of May 28, 1974, was substantially the same as that which he had given officers four times before; that afternoon, when police were investigating Shannon's disappearance, and three times that evening after he was

arrested. The relevant portions of his testimony are as follows.

He took Glenda to work in her white Ford Cortina (an unusual square–shaped car). He went to check on a job for himself for the day, then he and Shannon returned home about 7:30 a.m. They watched the morning television shows until 11 a.m. He recalled watching the Brady Bunch which is over at that time. Shannon then went outside to play and defendant drove to get the mail, leaving the little girl playing in the yard. He drove *past* the mailboxes because he had been having car trouble. The car would sometimes lose power and die unless it was coaxed. So he continued slowly to a turnout just past the Wind River Bridge 3/4 mile from home. He turned the car around and attempted some repairs under the hood for approximately 15 minutes, went to the mailboxes, then home, and discovered Shannon missing. This would have been about 11:30 a.m. Defendant checked back and forth between the house, the yard, and the neighbors, then finally inquired at the neighborhood grocery. He then went to tell Glenda.

Defendant's account of his activities up to 7:30 a.m. or so is undisputed. Also, a witness fishing under the Wind River Bridge attested to the fact that defendant's car went slowly past on the road above some time between 9 a.m. and 11 a.m. A neighbor corroborated defendant's statement that he was at the mailbox at about 11:20 a.m.

The woman who ran the grocery where defendant went to inquire about Shannon testified that she was sure of the time he was there. She had just looked at the clock and it was 10:55 a.m. This was inconsistent with the defendant's story since the television show he said he watched would not have been over; hence, he wouldn't have left to get the mail, which he also testified didn't come until after 11 a.m. each day. The defendant's story was sharply contradicted at another point by two witnesses who were collecting scrap iron that morning near the defendant's house. They testified that the white Cortina (with which they were familiar) was not there when they were, from 8 a.m. to 8:45 a.m.

Defendant's statement was that he and Shannon had been home the entire time until 11 a.m. Also, a coworker of Glenda's at the mill testified that defendant arrived at the mill at noon and told Glenda that Shannon had been missing "a couple of hours."

Aside from time discrepancies, there was the convincing testimony of the State's star witness, a Washington State University secretary vacationing at her mother's home, which is located on a little–used road leading to the culvert where the body was found. This woman testified that she was in her garden around 10 a.m., and observed a white compact automobile with a peculiar square back speeding toward the culvert, then returning to Home Valley 3 minutes later, also at a high rate of speed. She accurately described the shirt worn by the defendant on the day of the murder, and made an in–court identification of the defendant who was sitting in the audience. The witness said she had never seen the defendant before the day he drove by, nor had she seen him since, except for in court that day. She had never seen a photo or description of him. She was at the police station the night he was arrested, however, and the defendant claims she saw him then. She testified the car had bumpers (defendant's didn't) and that she was sure it wasn't bashed in (defendant's was).

On the day of the murder, having heard where the child's body was found, this witness went to the sheriff and was subsequently driven around town by a deputy to see if she could spot the car she had seen earlier. Upon passing the Emerson residence, she spotted the Cortina from a distance and said, "If that car is white, that's it." Both the witness and the deputy sheriff testified that she had not been coached in any way. The defendant continually denied being anywhere in the area of the culvert on that day.

There was evidence presented at trial that entitled the jury to find the following. The defendant was the last person to see Shannon on the morning of the murder. At 10 a.m. he was seen speeding to and from the culvert where Shannon was found dead, the culvert being a distance of

approximately 800 feet from where the witness saw him speed by. He was identified as the driver–operator of the Cortina, which was the car seen speeding to and from the culvert. Shannon's body was found in the culvert with a crushed skull, a rock resting on her head. It was reasonable for the jury to infer the defendant's guilt from these circumstances.

As to the charge of first–degree murder, we find the element of premeditation to be reasonably inferred from the evidence presented to the jury. It is not necessary that this court be satisfied of the defendant's guilt beyond a reasonable doubt; it is only necessary that we be satisfied that there is substantial evidence to support the jury's finding. *State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971).

Considering only the evidence most favorable to the State, and drawing every reasonable inference therefrom, we believe that the jury could reasonably have found the following to be the facts of the crime. The victim Shannon, already or soon to be bruised and bleeding from a beating, was transported 5 miles to the culvert where the death blow was administered with the rock found resting on her head. The fact that she was found clutching grass growing on the bank of the culvert was the basis for the pathologist's testimony that she died in the culvert. The facts that the murderer had to transport her 5 miles, take her down a steep bank, place her there and crush her head with a large rock, were sufficient for the jury to find that an appreciable period of time elapsed for the defendant to have deliberated the murder. *State v. Shirley,* 60 Wn.2d 277, 373 P.2d 777 (1962).

It is clear that premeditation can be proven by circumstantial evidence where, as here, inferences drawn by the jury are reasonable and the evidence supporting the jury's findings is substantial. Although there was no direct proof of intent, premeditation may still be found where intent is logically inferred from the facts of the crime. *State v. Smith,* 12 Wn. App. 720, 531 P.2d 843 (1975), *aff'd,* 88

Wn.2d 127, 559 P.2d 970 (1977). *Cf. State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968). The jury could properly conclude that the death was not the result of an impulsive, spontaneous act.

Next, the defendant assigns error to the admission of his statement, introduced in the State's case in chief. The defendant claims this evidence was inadmissible because (1) it was a statement of a juvenile taken during an impermissible full custodial interrogation by police; (2) the statement was taken without his being specifically apprised that he might be tried in adult criminal court rather than in the juvenile court; and (3) it was hearsay improperly introduced in the State's case in chief.

The facts of the investigation, arrest, and interrogation are as follows. In the afternoon, while investigating the victim's disappearance, police took a statement from defendant after giving him *Miranda* warnings. That evening, subsequent to further investigation and the discovery of the victim, police arrested defendant and charged him with first–degree murder. He was taken to the police station for interrogation and the juvenile officer was called. While awaiting his arrival the police questioned defendant, after first giving him his *Miranda* warnings. When the juvenile officer arrived 20 minutes later, defendant was giving the police the same statement he had given them that afternoon.

The juvenile officer informed defendant of his rights, and told defendant he was there to protect him. Defendant then gave a third statement to the juvenile officer. At 9 p.m. another deputy sheriff arrived, inquired if defendant knew his rights, and took his statement in the presence of the juvenile officer.

All four statements, the one in the afternoon prior to arrest, and the three in the evening after defendant had been arrested and charged with first–degree murder, were substantially the same. At the time of trial, defendant took the stand and testified to his whereabouts and activity on

the day of Shannon's murder, consistent with his former statements and at all times denying guilt.

The defendant's first contention is that a full custodial interrogation of a juvenile is impermissible under *State v. Prater,* 77 Wn.2d 526, 463 P.2d 640 (1970). This contention is based on the following language from that opinion on page 534:

> These rules apply to all proceedings conducted in the juvenile court, but they do not apply to police officers making inquiries which are reasonably indicated in making an arrest. *This is not to imply that the police may engage in a full custodial interrogation.* But it would be unrealistic to assume that an officer can properly perform his duties without asking questions.

(Italics ours.)

The italicized language must be considered in light of the facts of *Prater.* There the juvenile had been arrested and charged with taking and riding in a motor vehicle without the permission of the owner. *On the way* to the juvenile center (a 4-block trip) the officer questioned the juvenile and obtained his admission. This was prior to the juvenile's being turned over to the juvenile authorities, as required by RCW 13.04.120. Nevertheless, we deemed it admissible evidence, since under the facts of the case there was an intelligent waiver, and the questioning by the officer was reasonably indicated in making an arrest.

█ In the instant case we have a full custodial interrogation after the juvenile authorities had been contacted as required by RCW 13.04.120. The defendant had been repeatedly informed of his *Miranda* rights. The controlling juvenile court rule is JuCr 7.1, which provides:

> A child who is the subject of court proceedings has a right to remain silent and may refuse to answer any questions. . . . Whatever any person says after being warned of his rights may be used against him.

Nothing in *Prater* should be read to undermine the intent of that rule, or to proscribe full custodial interrogation of juveniles under circumstances such as these. *Prater*

set out the standards to be used in determining whether a juvenile's waiver of his rights was informed, intelligent, and voluntary. The concern there, as here, was to assure that a juvenile's constitutional rights be protected just as an adult's, and that no advantage be taken of naivete or imprudence or inexperience.

While we do not approve of the full custodial questioning of a juvenile prior to the arrival of a juvenile officer, we do not find that this defendant was in any way prejudiced by it. The statements given by the defendant both before his arrest and after the arrival of the juvenile officer were the same as the statement admitted at trial. Further, we respect the findings entered by the trial court pursuant to the CrR 3.5 hearing on the admissibility of defendant's statement:

> My perception of the intelligence and understanding of the defendant leads me to the conclusion that the statements made were not made as a result of the coercive impact of the questions by the authorities.

Defendant's second objection to the admission of his statement is that even though he was given *Miranda* warnings and waived them, it was not an intelligent waiver since he was not told that the statement might be used against him in adult criminal proceedings. Defendant asserts that under *Prater,* as interpreted in *State v. Davis,* 3 Wn. App. 684, 477 P.2d 44 (1970), he was not capable of giving an intelligent, knowing waiver, since he had little prior experience with the juvenile criminal system and was not specifically warned of the criminal ramifications of his statements. Defendant claims that the presence of the juvenile officer lent a nonadversarial parens patriae character to the proceedings which he relied on in making his statement.

We do not believe the defendant was misled. He was arrested for first–degree murder, the gravest of crimes, and put immediately into a patently adversarial setting at the jail with sheriff's officers and prosecuting attorneys. The attendance of the juvenile officer is required by law for the juvenile's protection. We can see no basis for the contention

that the juvenile officer's presence somehow eradicated the adversarial quality of the proceedings, such that the defendant would no longer comprehend the criminal ramifications of being arrested and questioned for murder. In fact, no parens patriae reliance ever existed in the first place. Defendant was not being treated as an errant child, or transported to juvenile facilities. Rather, he was treated throughout as any suspected murderer in the preliminaries of criminal proceedings, except for the requisite involvement of the juvenile officer.

In *Prater* we stated the following, quoting from *State v. Gullings,* 244 Ore. 173, 416 P.2d 311 (1966), on page 532:

> We do not believe . . . [there are requirements] prohibiting the use in adult proceedings of all information secured by police before remand. No "principles of fundamental fairness" are offended when the information is secured in a setting that is so patently adversarial as to be understood by the child. The *parens patriae* relationship does not exist between police and child but between court and child. Police are in the business of solving transgressions against the welfare of society and the apprehension of those who are responsible therefor.

Further, in *Prater* on page 534, we set out the test for an intelligent waiver by a juvenile:

> Whether there is such a waiver depends on a *number of factors* such as the age, intelligence and experience of the juvenile. Whether a proper warning is given and whether there is an intelligent waiver is a *factual matter for the court to decide in each case.*

(Italics ours.)

Applying this test to the facts before us, the defendant was within 6 months of being an adult, living as an adult in a meretricious relationship with the victim's mother who was pregnant with defendant's child. He was given full *Miranda* warnings, including "Anything you say can and will be used against you in a court of law." There was nothing in the totality of the circumstances which would

indicate that defendant made his statements with the notion that he would not be brought to criminal trial.

Although in the facts before us it was not necessary for the defendant to be specifically warned he may be tried in superior court rather than juvenile court, we emphasize what we stated in *Prater,* that determination of an intelligent waiver depends on the facts of each case. The proceedings are more obviously adversarial where there is a serious crime and full custodial questioning at the jail. The cautious, rigid approach taken in *Davis* to determining whether the defendant knew or suspected criminal prosecution was perhaps necessary. The crime there (forging his mother's signature to her pension check and negotiating it) and in *Prater* (taking and riding) was not of such gravity or social impact that criminal prosecution would almost inevitably flow from it. Here, however, the criminal ramifications of the conduct were so obvious that specific warning was not necessary.

 Finally, defendant asserts that his statement was inadmissible as hearsay, and could not be put on in the State's case in chief. Since the statement was not put on by the State to prove the truth of the facts asserted, it appears that it is not hearsay. The State put the statement into evidence and then went on to prove that in fact, the assertions made by defendant were false. There is authority for the position that statements of a party put in evidence against him are not hearsay. Fed. R. Evidence 801.

 Even if we were to view it as hearsay, it clearly is admissible as an exception to the rule, as we held in *State v. Green,* 158 Wash. 574, 291 P. 728 (1930). The facts of that case were similar to the case before us. The prosecutor introduced statements made by the accused during questioning after arrest, the accused claiming on appeal that his statements were not competent as substantive evidence, but should be limited to impeachment. We stated on page 581:

But this mistakes the rule. In both civil and criminal causes, an admission against interest by a party to the

action is admissible as evidence against him. The rule is, of course, different as to a mere witness. Statements made elsewhere by a witness contradictory of his testimony on the witness stand cannot be shown until after they are called to his attention and he is given an opportunity to admit or deny them and does deny them. But an admission against interest by a party to the action or proceeding is substantive, not impeaching, evidence.

Since the statement was totally exculpatory, defendant claims it was not an "admission." Although it mistakes the rule to say that an admission by a party cannot be put on as substantive evidence by the opposing party unless it was damaging when made, we nevertheless address the issue by citing an old United States Supreme Court decision on the point, *Wilson v. United States,* 162 U.S. 613, 40 L. Ed. 1090, 16 S. Ct. 895 (1896). *Wilson* held that exculpatory statements made to law enforcement officials, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force. *See also United States v. Lomprez,* 472 F.2d 860 (7th Cir. 1972), *United States v. McConney,* 329 F.2d 467 (2d Cir. 1964); *United States v. Farina,* 218 F.2d 62 (2d Cir. 1954); all holding false exculpatory statements admissible as substantive evidence of guilt consciousness, not limited to impeachment use.

We hold defendant's custodial statement to police to be voluntarily and intelligently given, and admissible as outside the ambit of the hearsay prohibition.

The next assignment of error relates to spots of blood found in defendant's car which were tested and found to be type O, the victim's blood type. Defendant asserts that since type O is also his own blood type, and the blood type of the victim's mother, the evidence had no logical relationship or legal relevancy to the crime, and should have been suppressed because it was inflammatory.

■ We do not agree. Although the pathologist's report on the blood type was in no way conclusive, it nevertheless had probative value and the jury was entitled to consider it. As we have often said in previous similar circumstances, the

objection goes to the weight rather than to the admissibility of the evidence.

Another assignment of error is that defendant was denied a fair trial because one of the jurors failed to divulge on voir dire that he had heard something of the case and discussed it with his tenant. Although the juror should have disclosed this information, the trial court nevertheless correctly found there was nothing in the record to show the juror was prejudiced against the defendant or that he failed to follow the court's instructions in rendering his verdict solely upon evidence at trial.

The defendant finally contends he was denied a fair trial by reason of the prosecutor's inflammatory statements in his closing argument to the effect that the defendant was a "liar," that he knew the jury would have the "guts" to "do what they're supposed to do," and that no trial would have been necessary had there been a witness to the murder.

We do not approve of the language used, or the admonishment as to the jury's duty. However, the statement that defendant was a "liar" finds support in the evidence in the case, and it is true that the jury had a duty to bring in a verdict based on the evidence.

We further strongly disapprove the statement that no trial would have been necessary had there been a witness. The implication is offensive to our entire system of criminal justice. However, no objection was made to the statement at trial, and we do not believe that the statement of itself was sufficiently prejudicial to justify our setting aside the verdict in an otherwise fair trial.

The decision of the Court of Appeals is reversed, and the judgment of guilty is affirmed.

STAFFORD, C.J., and HAMILTON, WRIGHT, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

UTTER, J. (dissenting)—I cannot agree with the majority that the facts of this case support a conclusion there was an intelligent waiver by the defendant of his *Miranda* rights

prior to giving certain in–custody statements. The defendant was a juvenile and at no time was informed adult criminal punishment could result from his statements. I accept the reasoning and language of Pearson, J., on this issue where he stated in *State v. Luoma,* 14 Wn. App. 705, 709–10, 544 P.2d 770 (1976):

The defendant was arrested on suspicion of murder at approximately 8 p.m. on May 28, 1974. He was taken to sheriff's headquarters and advised of his *Miranda* rights, which he waived. He was then questioned at the station by, or in the presence of, various law enforcement officials, including the sheriff, the prosecuting attorney, their deputies, and the juvenile officer. This was clearly a custodial interrogation, *State v. Vining,* 2 Wn. App. 802, 472 P.2d 564, 53 A.L.R.3d 390 (1970), and at no time during this questioning was the defendant told adult criminal punishment could result from the statements he made. On the contrary, . . . the juvenile court officer who was present during most of the questioning told the defendant he was there to protect the defendant's rights.

*State v. Prater,* 77 Wn.2d 526, 463 P.2d 640 (1970), recognizes that statements made by a juvenile suspect to police during a custodial interrogation, if preceded by *Miranda* warnings and waiver, may be admissible in an adult criminal proceeding if it was made clear to the juvenile, either because of warnings by the police or because of the circumstances surrounding his statement, that he was involved in an adversarial situation rather than the close, noncriminal relationship which exists between juveniles and juvenile court authorities, and that criminal prosecution was possible.

While a juvenile's prior experience with law enforcement authorities may be sufficient to meet the requirements set forth in *Prater, State v. Davis,* 3 Wn. App. 684, 477 P.2d 44 (1970), the defendant in this case had had no such prior experience. In fact, the juvenile officer's assurance that he was there to protect Luoma's rights militates against any inference that the defendant understood the adversarial nature of the inquiry in which

he was involved. We believe the statement secured by the police in these circumstances failed to meet the requirements of *State v. Prater, supra,* and should, therefore, not have been admitted at trial.

We should require, where a nonadversarial situation exists as it did in this case, a clear statement to a juvenile by the interrogating officer, in addition to the *Miranda* warnings, that adult criminal punishment can result from the statements he makes. To fail to do so invites an appeal in every case where no such statement is made.

The totality of circumstances in this case does not support a conclusion the defendant knew his statements could be used in adult prosecution. The fact that the crime charged was first-degree murder cannot be said to give the defendant constructive knowledge he would be charged as an adult. Juvenile courts throughout the state, in countless hearings, have exercised their discretion to determine whether even the gravest charges may be better handled at a juvenile, rather than adult level. Referral for adult prosecution is not and should not be assumed to be the automatic reaction of a juvenile court.

The statement in the *Miranda* warnings that "Anything you say can and will be used against you in a court of law" does not, even on its face, refer to adult, as distinguished from juvenile, prosecution. Finally, the juvenile officer's statement during interrogation that he was there to protect the defendant's rights, is convincing proof that there was a nonadversarial interrogation.

The record fails to show the defendant was aware he could be prosecuted as an adult before his in-custody statements were taken and they should be suppressed. This does not mean the defendant will necessarily go free. The case should be remanded for new trial where a noncustodial statement made by the defendant during the afternoon of

May 28, 1974, would be admissible for reasons noted in the Court of Appeals opinion, *State v. Luoma, supra* at 710–12.

ROSELLINI, J., concurs with UTTER, J.

Petition for rehearing denied March 14, 1977.