THE STATE OF WASHINGTON, *Respondent,* v. EDWARD COHEN, *Appellant.*

*Harry L. Johnsen,* for appellant.

*Samuel C. Rutherford, Prosecuting Attorney,* for respondent.

RoE, J.—Defendant appeals from a judgment on a jury verdict finding him guilty of second–degree murder. He urges six assignments of error, which will be dealt with seriatim.

I. *Constitutionality of the search warrant.*

Deputy Sheriff Michael Murray of Okanogan County executed an affidavit upon which a search warrant was issued. Defendant seeks to suppress the evidence secured on the grounds that the affidavit was inadequate, and that the warrant was defective for lack of particularity.

## A. *Adequacy of the affidavit.*

In the affidavit, Deputy Murray states that he located the victim's body, and then interviewed Amy Frank. She averred that she had been riding in a car with the victim, the defendant, and two other people. She told how the car had stopped, and described the place, which was near where the body was found. She also told him how the defendant, having left the car with the victim, later had returned alone and made a self–incriminating statement.

■ She further told Deputy Murray that, later the same day, the license plates were taken from the car and transferred to another. She described the location of the bushes in which the first car was then hidden. Defendant attacks the affidavit because it does not specifically reveal that Amy Frank had personal knowledge of those latter events. Defendant cites *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), in which a warrant was held defective since it did not disclose why the affiant could rely on his unidentified informant. The informant's suspicion, belief, or mere conclusion appeared to have been accepted as the basis for the warrant. An affidavit must present some underlying circumstances from which the magistrate may conclude that the information is credible and reliable. When the informant's identity is concealed, supporting information must provide to the issuing magistrate, a stronger basis for finding that hearsay evidence is credible, than if the informant is identified. *United States v. Harris,* 403 U.S. 573, 29 L. Ed. 2d 723, 91 S. Ct. 2075 (1971).

As stated in *State v. Helmka,* 86 Wn.2d 91, 93, 542 P.2d 115 (1975):

> In performing his independent, detached function, the magistrate is to operate in a commonsense and realistic fashion. He is entitled to draw commonsense and reasonable inferences from the facts and circumstances set forth. *Irby v. United States,* 314 F.2d 251 (D.C. Cir. 1963); *State v. Peterson,* 3 Wn. App. 946, 478 P.2d 745 (1970).
>
> . . .

When the magistrate has determined that probable cause exists, we should and do give considerable weight to that conclusion. The reviewing court should not engage in a hypertechnical examination of the affidavit. The United States Supreme Court has said:

> [W]hen a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*United States v. Ventresca* [380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965)], *supra* at 109.

We do emphasize, however, that search warrant cases largely must be determined and evaluated on a case by case basis. The general rules must be applied to specific factual settings. We caution that the facts stated, the inferences to be drawn, and the specificity required must fall within the ambit of reasonableness, all to the end that we never authorize general, exploratory searches.

Here, the affidavit showed that the identified informant had actually been with the group that day. The officer's having found the body corroborated her recital and her credibility. There is no statement that she had left the group before the plates were switched. She was a friend of all those involved, and was in such a position that her knowledge of the events would not normally be suspect. Clearly, this was more than mere guess, suspicion or conjecture by an unidentified informant of untested credibility. The supporting affidavit was adequate.

### B. *Particularity of the warrant.*

Defendant also argues that the warrant did not describe the items to be seized with sufficient particularity, as required by the Fourth Amendment. The warrant directed a search of certain real property in a remote area, described by reference to section, township and range. Attached to the affidavit was an aerial photograph of the area. The

warrant directed search for a 1962 or 1963, gray, 4-door Plymouth.

■ Reasonable particularity is all that is required. In *State v. Withers,* 8 Wn. App. 123, 504 P.2d 1151 (1972), a warrant authorizing seizure of "merchandise from disabled ship Don Jose" was sufficient to authorize seizure of all types of goods that the ship carried. Here, the vehicle seized was on the premises described. There was no confusion as to which automobile was involved. It was a 4-door car, gray in color, but it was a Pontiac, not a Plymouth.

That the informant was mistaken about the precise brand name of the car, and about the model year, should not be sufficient reason to suppress the evidence. Cf. *United States v. Jones,* 366 F. Supp. 237 (W.D. Pa. 1973), aff'd, 493 F.2d 1402 (3d Cir. 1974), in which a federal agent mistook an antique pistol for a sawed-off shotgun, but did not thereby render the search warrant invalid. When two types of autos look similar, mistaking one for the other should not render the warrant insufficient. In *Ballew v. United States,* 389 F. Supp. 47 (D. Md. 1975), a Ford Bronco was erroneously called a Jeep, but that mistake did not invalidate the warrant. This warrant was sufficiently clear; it did describe the article to be seized with sufficient clarity to enable the officers to identify it without the aid of information not contained in the warrant.[1] Cf. *State v. Chisholm,* 7 Wn. App. 279, 499 P.2d 81 (1972).

## II. *Right to independent testing of the evidence.*

George Alex was killed on or about October 9, 1976. On October 10, defendant was arrested, and remained in jail. According to CrR 3.3, he should have been brought to trial within 60 days of his preliminary appearance of October 11, or by December 10. His trial actually began on December 8. As the December 2 trial date approached, the state crime laboratory had not completed its tests of certain physical evidence (such as blood and fingernail scrapings from the

---

[1]In view of the disposition we make, we do not reach the question of whether defendant had standing to object to the search for his car on his father's land.

defendant and the victim, and blood from clothing and the car). The lab had returned neither the material nor the test results. As a result, the defendant was unable to procure independent tests within the 60–day period.

There was no allegation of misconduct by the prosecutor, or of any attempt to short–time the defendant. The delay was due to the limited capacity of the crime lab. When the material finally did come back, the defendant stated that the closest qualified lab for him to use was in California, or possibly in Alaska. There was no suggestion of when tests could be done.

In view of these circumstances, the defendant could have moved for a continuance under CrR 3.3(e)(1). The defendant declined. While the court probably could, under CrR 3.3(e)(3), have continued the case on its own motion, it chose not to do so in light of defendant's insistence upon an immediate trial. The record indicates that the trial court was willing to accommodate defendant's desire for independent tests of the evidence, but not to the extent of inviting a claim of reversible error by continuing the case, on its own motion, beyond the 60 days.

■ The following colloquy clearly expresses the situation, when the defendant insisted on a trial within 60 days and also upon suppression of the expert testimony respecting the evidence:

THE COURT: But I will grant you a continuance for you to conduct your further investigation. I don't feel that you are really being denied of your right of confrontation with witnesses, or the right to prepare for it, unless I was to refuse a continuance. And I indicated and have at all times that I will give you a continuance and even cut my vacation off to get you to an as early trial date as possible, which the next date would be the 20th of December.

MR. JOHNSEN: Yes. I understand that. It is still our position that he has the right to be brought to trail [sic] within sixty days. And since we were not able to get this material back from the lab in time to have it tested there is an alternative that preserves both his right to confront the witnesses, we simply don't let them testify about the evidence, so there is nobody to confront and he is still

brought to trial within the sixty days. And as long as that alternative exists I don't feel that I can waive one of those rights, either the right to confront or the right to a speedy trial. That essentially is the position I'm put in.

The defendant also suggested that, since the evidence was meaningfully unavailable to him due to lack of time to have it tested, the case should be dismissed.

Since the physical evidence in question has not been destroyed, dismissal of the charges would be inappropriate. *State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976). Further, the defendant does not have an unconditional and absolute right to be tried within 60 days. For example, the court may on its own motion extend the trial beyond that time for good and sufficient reasons. CrR 3.3(e); *State v. Jack,* 87 Wn.2d 467, 553 P.2d 1347 (1976).

Defendant's claim that he has to waive one right to preserve another is without merit. Defendant was unable, through no fault of his own, to prepare his defense as thoroughly as he desired to within the time available. But his own refusal to seek a continuance, when it was necessary to prepare his own case, should require neither suppression of the evidence nor dismissal of the charge.

Defendant cannot suppress the prosecution's evidence by claiming that he had no time to prepare to rebut it when, at the same time, he refused to seek a continuance to do so. That is not a search for the truth. The defendant attempted to "corner the court" between these two considerations, and most certainly could have been expected to urge a violation of the 60–day rule had the court granted a continuance sua sponte. He is not permitted to claim the benefit of his obduracy to seek a reversal. We find no error in the proceeding.

III. *Defendant argues that venue and jurisdiction were not proved.*

There was no doubt that the victim, George Alex, was killed. His body was found on a road near the Canadian border. No surveyor testified that it was south of the 49th

parallel, but many witnesses stated that it was in Okanogan County, including Rodney Levell, a meter reader for the Okanogan County P.U.D., who discovered the body in his work area; Deputy Sheriff Murray who also testified regarding the piece of the victim's dentures found about 2 feet from the body; and the rock with blood on it, the apparent murder weapon; and the indentation on the ground whence it had apparently been removed. Testifying also that the body was 150 to 200 yards south of the border was Constable Richard Brach, a member of the Royal Canadian Mounted Police; also Deputy Sheriff Kerri Wright testified the body was approximately three–fourths to 1 mile south of the border. Deputy Sheriff Robert Tyrrell testified the body was 100 to 200 yards south of the border.

■ Venue must be proved, like any element of the crime, but may be proved by either direct or circumstantial evidence. *See State v. Kincaid,* 69 Wash. 273, 124 P. 684 (1912). Here, there was more than circumstantial evidence. There was direct testimony of several knowledgeable law officers as well as residents of the area, that the body was found in Okanogan County. The circumstances were such that the jury could easily find the murder did take place there.

There was no testimony that the body was found north of the border. No case has been cited holding that lay people are not competent to testify to boundaries or venue. In fact, the contrary is true since such may be proved by circumstantial evidence. Most residents and law officers know where they live and the geographical limits of their jurisdiction. The evidence was sufficient for the jury to have determined this fact. There was no error.

IV. *Evidentiary privilege.*

Defendant sought to invoke RCW 5.60.060,[2] and objected

---

[2]RCW 5.60.060 provides:

"(1) A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of

to the State's calling Stella Snow as a witness, alleging the spousal privilege. Stella Snow is a Canadian Indian; the defendant is a Colville Indian and an American citizen. Two children have been born of their 4–year relationship, but they have never married formally or by Indian custom. Stella Snow stood to lose certain Indian rights if she married outside her band.

■ The husband–wife evidentiary privilege spreads its shelter over an existing marriage. The policy behind the privilege is that it fosters domestic harmony and prevents discord. *State v. Thorne*, 43 Wn.2d 47, 260 P.2d 331 (1953). It would be a simple answer to say that the purpose of the statute is to protect marriages, and not to approve meretricious relationships, but even the statute is not absolute. It permits such testimony when one spouse has committed a crime against the other, or against a child of whom either is a parent or guardian. The statute contemplates legal marital status; it applies only when there is a valid, existing marriage, and it applies even if such a marriage is in name only, *State v. Grasser*, 60 Wn.2d 343, 374 P.2d 149 (1962).

In a case involving communications between a probation officer and his client, this court was urged to create such a privilege for public policy reasons. The court declined to do so, quoting from 1 McCormick & Ray, *Evidence* § 502, at 424–25 (2d ed.):

> "[I]n the absence of statute the courts have rarely extended to other relationships the protection which the common law afforded to communications between attorney and client and husband and wife. . . ."

*State v. Johnson*, 9 Wn. App. 766, 773, 514 P.2d 1073 (1973). The court stated that the legislature is the proper forum for such arguments.

---

the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, nor to a criminal action or proceeding for a crime committed by said husband or wife against any child of whom said husband or wife is the parent or guardian."

Courts have recently given recognition to the equities respecting property acquired during a quasi–marital relationship, but that does not suggest that a privilege against testifying, a suppression of the truth, should arise from such an arrangement.

Guidelines for such a rule would be practically impossible to formulate. Must both be eligible for marriage? How long—a day, week, month or years—must the relationship have existed? What degree of attachment or contact is necessary? At least the present rule provides the easily fixed termini of the duration of the marriage, and enjoys a public policy desideratum. Defendant has submitted no cases supporting his position. We find no error in permitting Stella Snow to testify.

V. *Nondisclosure of evidence by the prosecution.*

Shortly after the defendant was arrested, Stella Snow gave a written statement to the police. Since she is a Canadian citizen and was not in custody, her deposition was taken for use at the trial if she should not appear to testify. She was deposed on December 1; counsel was present. The trial was then set to begin December 8, and she was served with a subpoena to appear on that day. She did appear when the trial began, but was somewhat intoxicated. She was taken into custody as a material witness, so that she would be available to testify the next day.

When she was booked into jail, a pipe containing marijuana residue was found on her person. The prosecuting attorney chose to advise Stella Snow that he was not going to charge her with that crime, because of the seriousness of the murder case and her apparent reluctance to testify. The prosecutor did not notify defense counsel of this practical grant of immunity and although counsel's affidavit does not say when he learned of this, he presumably did not know, since he urges this as error, until after Stella Snow had testified on December 9. Counsel recognizes that only impeaching evidence, not substantive evidence, is involved.

He claims, under CrR 4.7(a)(3)[3] and (h)(2)[4] and the rationale of *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1964), that the prosecutor failed to disclose evidence in his possession favorable to the defendant on the issue of guilt. *Brady v. Maryland, supra,* was a murder trial with two defendants being separately tried. Brady was convicted in the first one, but the prosecutor had concealed from Brady's counsel the fact that the codefendant had admitted the actual homicide. In reversing, the Supreme Court held that the suppression of the confession of others was a denial of due process. It is the duty of the prosecutor upon request to furnish evidence favorable to the accused, irrespective of good faith. A prosecutor who withholds evidence of an accused which, if made available, would tend to exculpate him or reduce the penalty, does not comport with standards of justice. The evidence in the above case was substantive. In *Brady,* the court favorably mentioned *Napue v. Illinois,* 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), where it was held to be a violation of due process for the prosecution to stand idly by and do nothing to correct an erroneous statement by a government witness already convicted and sentenced for the same crime, to wit, that he had been promised some consideration by a public defender for his testimony, when actually it was the prosecutor who had promised to try to do something for him. The jury could well have believed that the witness fabricated his testimony to curry favor with the prosecutor. Thus, a conviction may be tainted even if the false testimony goes only to the credibility of the witness.

---

[3]CrR 4.7(a)(3) provides:

"Except as is otherwise provided as to protective orders, the prosecuting attorney shall disclose to defendant's counsel any material or information within his knowledge which tends to negate defendant's guilt as to the offense charged."

[4]CrR 4.7(h)(2) provides:

"If, after compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified."

Of similar import is *Giglio v. United States,* 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), where false testimony was given by a government witness and prospective defendant in reference to the fact that he definitely would be prosecuted if he did not cooperate at the trial.

None of these cases is precisely in point. In this case, there is no evidence that any false testimony was given by Stella Snow; rather, the testimony was consistent with the previous statement and deposition given before the favorable treatment by the prosecutor. Further, the immunity statement by the prosecutor was not bargained in exchange for favorable testimony. Nevertheless, we believe a duty arose upon the prosecutor to advise defense counsel of this occurrence, even though it concerned a possible criminal charge unrelated and remote in time and gravity to the charge upon which the defendant was being tried. *See State v. Finnegan,* 6 Wn. App. 612, 495 P.2d 674 (1972).

In *State v. Finnegan, supra,* the court held it was error for the prosecutor to have failed to disclose to the defense that a codefendant–witness had twice attempted suicide, which might possibly go to competency or credibility. But it was held to be harmless error because the test is, did the defendant get a fair trial? There also, it was not the admission of illegal or false evidence, but the omission of valid evidence, although impeaching. In finding the error was harmless, the court stated its belief beyond a reasonable doubt that had the information been presented to the jury, the verdict would have been the same.

The standard, as stated in *Napue* at page 271, is that the evidence is material if it "could . . . in any reasonable likelihood have affected the judgment of the jury . . ."

The case at bench is unlike *Giglio v. United States, supra,* which follows *Brady* and *Napue,* in that *Giglio* reversed a conviction for failure to disclose a promise not to prosecute the key witness, but the prosecution's case had "depended almost entirely on" that witness' testimony. Cohen's prosecution did not "depend almost entirely" on Snow's testimony. Her testimony was not as critical as in

the cases cited by defendant. She was one of several witnesses in the car. Her testimony was corroborated. There is no showing that the test of *Giglio,* namely, a new trial is required if *"the false testimony* could . . . in any reasonable likelihood have affected the judgment of the jury", has been met. (Italics ours.)

Two other witnesses, Amy Frank and Jim Squakin, also testified to the fact of defendant's admission, when he returned to the car alone, that he had killed the victim. Both witnesses did admit being drunk and sleepy at the time. While Squakin in particular seems to have a fuzzy memory, he did, upon repeated direct and cross–examination, eventually arrive at an account which directly incriminates the defendant. These two witnesses plus a third, the defendant's uncle, William Cohen, are all consistent and clear in testifying that defendant and victim left the car together and only defendant came back with blood on one hand. The victim was found killed in that area, a lonely road near the Canadian border.

Snow's testimony was, then, merely cumulative on these points, but it was particularly important because of her relationship with the defendant and because she was the only witness who, at the time, was sober. However, unless the trial judge particularly suspected the other witnesses' believability, the case could have gone to the jury even without her testimony. The physical evidence was consistent with guilt.

Even if the jury had known of the promise not to prosecute, the possibility that a jury might have reached a different verdict is not sufficient to raise a reasonable doubt. The evidence was not sufficiently material, under *Giglio* and *Napue,* nor was the error sufficiently prejudicial, under *Finnegan,* to require reversal.

■ Respecting the claim of insufficiency of the evidence to convict, the court need not be satisfied of the defendant's guilt beyond a reasonable doubt. It is only necessary that there be substantial evidence to support the jury's verdict. *State v. Luoma,* 88 Wn.2d 28, 558 P.2d 756 (1977).

As was discussed above and reflected in the record, there certainly is enough evidence, even ignoring Snow's testimony, to meet this standard.

Because of the nature of the charge, we have elaborated possibly somewhat more than might be necessary. We have carefully considered the assignments of error and find no prejudice. Defendant was given a fair trial.

The conviction is affirmed.

GREEN and McINTURFF, JJ., concur.

Reconsideration denied May 12, 1978.

Review denied by Supreme Court October 20, 1978.

[No. 2626–3.   Division Three.   March 29, 1978.]