[No. 6107–1. Division One. October 15, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. SCOTT
G. SUTHERLAND, *Appellant*.

*John Henry Browne,* for appellant.

*Russ Juckett, Prosecuting Attorney, David G. Metcalf, Special Deputy,* and *James B. Roche, Deputy,* for respondent.

DORE, J.—Defendant Scott G. Sutherland was found guilty of first–degree murder, with special findings that at the time of the victim's death the defendant was armed with a deadly weapon and firearm. Defendant appeals. We affirm.

## ISSUES

1. Was it proper on redirect examination to admit testimony, over objection, that a key State's witness, a one–time suspect, had been given lie detector examinations?

2. Was it error to permit a .38 Smith & Wesson revolver to be shown to the jury as demonstrative evidence?

3. Was it prejudicial error for the prosecutor to fail to disclose to the defense information of a State witness, which the defense claims would have been helpful to its alibi defense?

4. Was it prejudicial error for the trial court to instruct that defendant could be found guilty as an aider or abettor?

5. Was it error for the court to instruct (instruction No. 20) that the jury need not be unanimous to convict defendant on the issue as to whether defendant was an aider and/or abettor, or participant in the murder?

6. Was there prosecutory misconduct in bringing the jury's attention to the fact that defendant did not take the stand to testify on his own behalf?

## FACTS

On April 15, 1977, an elderly couple in rural Snohomish County, near Monroe, discovered a body buried beneath a clump of cedar and fir branches. The police investigation revealed that the deceased was Eric Brankey, a drug pusher who was known to carry large sums of money on his person. Brankey had not been seen since March 19, 1977, when he left a telephone number where he could be reached. The telephone number was a Monroe telephone number listed to Brian Gjerde, whose house was located 1/2 mile from where the body was discovered. Five days after the body was discovered, Gjerde contacted the sheriff's office and advised that he had knowledge concerning the deceased. In exchange for immunity, he gave an extensive statement to the police, implicating the defendant.

Gjerde testified at the trial that the defendant had contacted him in March 1977, requesting that he pilot a private plane for him and offered him $5,000 for such services. It was Gjerde's belief that the flight had something to do with controlled substances. On the agreed day of the flight, March 18, 1977, the weather prevented Gjerde from leaving Boeing Field, so he made alternate plans to rent a plane at an airport near Monroe. Gjerde and the defendant met at Gjerde's residence at 11:15 that morning. Gjerde then left for the airport where he was to take a flight test to determine if he could rent a plane. The defendant arrived at the Monroe Airfield about 1 p.m. and Gjerde told him that he

had not been approved for flying and that he could not rent an airplane. The defendant and Gjerde then returned to Gjerde's residence by separate vehicles. Gjerde arrived at his home some 10 minutes before the defendant and when he walked into his residence he found blood on the floor and the furniture awry. According to Gjerde, the defendant then arrived and advised that he had some trouble with his companion and "had to hurt him." Sutherland showed Gjerde a bullet hole in the wall and suggested a picture be moved to cover it. This was done. The defendant then burned some items in Gjerde's stove and had Gjerde assist him in punching holes in the trunk of the blue car that defendant had been driving. The trunk of the car was then hosed out, leaving a bloodish–colored stain in Gjerde's driveway. Defendant then paid Gjerde $2,000 in $100 bills and told him to take care of the damage and forget about it.

The police subsequently searched Gjerde's home and removed a .38 caliber slug from the wall of the living room. The defendant was subsequently charged with the first–degree murder of Brankey. The defense was an alibi, although the defendant never took the stand in his own behalf.

## DECISION

ISSUE 1: Defense invited questions concerning use of polygraph.

Error claimed by the defense pertains to certain testimony elicited on redirect examination by Detective Ben Duncan, the supervisory investigator of the Brankey homicide. The defense, by various questions on cross–examination, had implied that Duncan had performed incompetent investigation because he had not taken the fingerprints or pictures of two other suspects. In order to offset this testimony, the court permitted witness Duncan to testify that he had submitted the other two suspects to polygraph or lie detector examinations, the apparent inference of this latter

testimony being that the other suspects had passed the polygraph test and they no longer were suspects in the murder.

In *People v. Sweeney*, 46 Ill. App. 3d 858, 361 N.E.2d 344 (1977), a nonresponsive answer brought out that a witness had taken a polygraph. The court held such mention was not reversible error, the only remedy being a motion to strike the answer. The court pointed out that the rule prohibiting admissibility of the results of such test did not govern where the only reference was to the fact that the test had been taken.

In *State v. Green*, 271 Ore. 153, 167, 531 P.2d 245 (1975), the issue was what, if any, references to a polygraph examination were proper, where a defendant gave a confession during or following such an examination. After observing that the scientific value and accuracy of the polygraph was still in doubt, the court noted:

> The question remains, however, whether in such a case the state may offer in evidence before the jury the fact that the confession was given following a polygraph examination and, if so, whether the state may also offer in evidence either the results of the examination or details relating to the examination.

The court quoted extensively from Reid & Inbau, *Truth & Deception: The Polygraph ("Lie–Detector") Technique* 254 (1966), and included the following at page 170:

> *The choice, therefore, will rest with the defense attorney as to whether or not he wants to inject the Polygraph issue into the case* for the purpose of attempting to show that it or the technique was a coercive factor which compelled the defendant to confess." (Emphasis added)

■ In the subject case the defense knew in advance that the reason that Detective Duncan did not give other tests to the other suspects was that he had satisfied himself that they were telling the truth because he had given them lie detector tests. When the matter was taken up by respective counsel with the court outside the presence of the jury, the court indicated that defense questions as to the Duncan

investigation were proper in reference to the suspects. However, the trial judge cautioned defense counsel that if he asked such questions and elicited answers, he ran the risk of opening up the entire subject. It would only seem fair that upon cross–examination, if parts of the officer's investigation in favor of the defense were brought out, he could give the entire picture by telling what other steps of investigation he conducted to explain why he didn't give the routine fingerprint and picture tests to the other suspects. The court did not permit an unbridled release of information pertaining to the polygraphs but restricted the questions and answers merely to the fact that polygraphs had been taken of the suspects. We find no abuse of discretion on redirect examination of witness Duncan in the trial court permitting a question and answer limited to whether or not a polygraph was given to other suspects.

ISSUE 2: Showing jury .38 Smith & Wesson revolver for demonstrative purposes during trial was not error.

 Examination of the bullet fragments removed during autopsy upon the victim Brankey, as well as a slug removed from a wall in the Gjerde house disclosed certain characteristic markings known as "riflings" upon the three slugs and fragments. An expert testified these markings indicated the bullets, which were .38 in size, were fired from a weapon rifled with "five lands and grooves, right twist." He also testified that among the make of weapons which would produce such markings was a .38 Smith & Wesson revolver. He further identified the make and model of the exhibit and explained its operation. He used the weapon for illustrative purposes only. The use of weapons for illustrative purposes in murder and assault cases is within the discretion of the trial court, and has been previously approved by the courts of this state. *See State v. Allen,* 72 Wn.2d 42, 431 P.2d 593 (1967).

In the subject case, although the State was not able to place the defendant in possession of a weapon matching the

rifling characteristics of the slug in question on or near the date of the killing, it was able to establish that Sutherland had purchased a .38 Smith & Wesson revolver—one of the makes of weapons which could, according to witness Wilkes, produce the precise physical characteristics found on the bullets he examined. Further, the State showed an absence of any record of transfer of that weapon, until the time of Brankey's death.

We hold that it was not an abuse of the trial court's discretion to permit the jury to view a .38 Smith & Wesson revolver for illustrative purposes.

ISSUE 3: Failure of prosecutory disclosure not prejudicial error.

The State had called as one of its witnesses, Nicholas Karras, a friend of Sutherland for the past 15 years, for the purpose of attempting to show evasive action on the defendant's part on April 20, 21 and 22, after he had called Brian Gjerde and learned of the police involvement. After the defendant's conviction, the defense procured an affidavit[1] from Karras indicating he had called one of the deputy prosecutors trying the case on August 8, 1977, and had advised him that by "checking his records" he had determined that Scott Sutherland had called him around noon on March 19, 1977.

---

[1]"NICHOLAS KARRAS, being first duly sworn, on oath deposes and says:

"That I testified in the trial of the above–entitled cause. That one of the questions asked me by MR. PATTERSON, defense counsel, was if I had received a phone call from the defendant, SCOTT SUTHERLAND, around March 19th, but I indicated I wasn't sure of the date without checking my records. That when I went home I looked at my calendar and found I had talked to SCOTT on March 19th around noon. That when I had ascertained this, I called the prosecutor, RANDY FURMAN, on August 8, 1977 and talked to him around the noon hour; that I told MR. FURMAN I had consulted my records and had talked to SCOTT on the 19th of March around noon; that MR. FURMAN didn't say too much, indicating he was in a hurry because it was trial recess, but just said he would let me know if he needed me again.

"/s/ _____
Nicholas Karras"

On a motion for new trial based on this affidavit, the defense alleged that this withheld information was important substantive evidence.

Karras had testified concerning the phone call that the defendant had made to him regarding a birthday party for a Ms. Thomas (defendant's girlfriend). From his account he had determined the call was made on March 19, 1977 (the day the murder occurred), at approximately 7 p.m. (the time the defendant was allegedly at Gjerdes' residence). In opposing the defendant's motion the prosecutor urged that failure to provide the information was because the prosecutor did not think that it was relevant or significant, and that at best it was inconclusive.

In *State v. Wright,* 87 Wn.2d 783, 786-87, 557 P.2d 1 (1976) in a destruction of evidence case wherein the prosecution destroyed evidence material to the defense and wherein the court dismissed the first–degree murder conviction, the court stated:

> Due process imposes certain obligations on law enforcement and investigatory agencies to insure every criminal trial is a "search for truth, not an adversary game". *United States v. Perry,* 471 F.2d 1057, 1063 (D.C. Cir. 1972). One such constitutional obligation, the disclosure of evidence to the defendant, is well established. "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). *See Giglio v. United States,* 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972); *Seattle v. Fettig,* 10 Wn. App. 773, 519 P.2d 1002 (1974).
>
> . . . Of course, neither the police nor the prosecution are to decide for the defense what is favorable or material evidence. *Cf. Barbee v. Warden,* 331 F.2d 842, 845 (4th Cir. 1964); *Griffin v. United States,* [183 F.2d 990 (D.C. Cir 1950)] *supra,* at 993. If the defense has established that the suppressed evidence is material, the court may conclude that due process has been denied and that the error can be corrected by a new trial at which the defendant will have full access to the evidence.

Two years after *Wright,* the Court of Appeals decided *State v. Cohen,* 19 Wn. App. 600, 576 P.2d 933 (1978), concerning a murder case involving a motion for a new trial based on nondisclosure of evidence by the prosecutor. In *Cohen,* a material witness was booked into jail and a pipe containing marijuana residue was found on her person. The prosecuting attorney advised the witness that he was not going to charge her with that crime because of the seriousness of the murder case and her apparent reluctance to testify. The prosecutor did not notify defense counsel of this practical ground of immunity and although counsel's affidavit does not say when he learned of this, he presumably did not know prior to her testimony, since he urges this as error after the witness testified.

In *Cohen* it was held that the prosecutor's failure to disclose the fact of immunity was not prejudicial error. The court reasoned at page 612:

> Even if the jury had known of the promise not to prosecute, the possibility that a jury might have reached a different verdict is not sufficient to raise a reasonable doubt. The evidence was not sufficiently material, under *Giglio* and *Napue,* nor was the error sufficiently prejudicial, under *Finnegan,* to require reversal.
>
> Respecting the claim of insufficiency of the evidence to convict, the court need not be satisfied of the defendant's guilt beyond a reasonable doubt. It is only necessary that there be substantial evidence to support the jury's verdict. *State v. Luoma,* 88 Wn.2d 28, 558 P.2d 756 (1977).

Although Karras was called as a witness for the State, the fact is that he was a long time and close friend of the defendant. From reading Karras' testimony on cross–examination, it is clear that any favorable testimony, of which he might have knowledge, was available to the defendant and his attorney.[2]

---

[2] Q [By Mr. Patterson] Mr. Karras, you indicated in your testimony that you had frequent contact with Mr. Sutherland for a number of years?

A That is true.

Q Did you have any contact with him on the 19th of March?

A The 19th of March?

A reading of the direct examination of Karras discloses that the testimony brought out on cross was unrelated to his testimony on direct. Apparently the defense had some peculiar point it wished to make. This was confirmed because at the time of the new trial motion the State asked Mr. Patterson to state for the record the source of the question to Karras. He stated that he had asked "because my client told me to do so."

▇ The prosecution has a duty to disclose evidence favorable to the defendant. Assuming for the moment that evidence here is indeed favorable, any failure of disclosure by the prosecution cannot be error where the defense has equal access or knowledge of such evidence. This was the case here. The State had no particular reason to view such information as favorable in the first place, and was wholly in the dark as to what the defense was driving at as is demonstrated not only by the deputy prosecutor's new trial

---

Q Um–hum.

A I was working on that day.

Q Do you know whether or not you had a phone call conversation with him?

A Yes, he phoned me that evening.

Q And about what time?

A Oh, approximately 7:00.

Q And what was the subject matter?

A It was Elaine's birthday, I believe, and he just wanted to invite us over for her birthday party.

Q Had he talked to you about a car during that period?

A We had discussed a Corvette.

Q Was this conversation on the 18th or the 19th?

MR. FURMAN: I object to that as being beyond the scope of direct.

MR. PATTERSON: Well, Your Honor—

MR. FURMAN: It has been asked and answered, I thought.

THE COURT: I thought it had been asked and answered.

THE WITNESS: I could have been wrong on the date.

THE COURT: Just a moment, please.

MR. PATTERSON: Well, Your Honor,—THE COURT: Just a minute. The objection is overruled.

Q [By Mr. Patterson] Are you certain as to the date?

A I am not sure—it just would depend on whether it was Saturday or Sunday. I could remember better then.

MR. PATTERSON: I have no further questions.

motion, but by the lack of redirect examination after Karras testified on direct.

In *State v. Falk,* 17 Wn. App. 905, 567 P.2d 235 (1977), the State during trial learned of a statement by the defendant and used it in rebuttal without first disclosing it. Although held erroneous, the court found mistrial on reversal improper because as to the defendant, "[t]he evidence consisted of a matter peculiarly within his own knowledge, his own statement." *See also State v. Riggins,* 11 Wn. App. 449, 523 P.2d 452 (1974). (Identity of informant known to defendant; disclosure not required.)

Karras had originally testified the phone call on the 18th or 19th at 7 p.m. was about a Corvette. His later affidavit merely states he "looked at his records." We are left to speculate as to whether this was a phone bill, a diary, or something else; whether he now would say there were two calls (or even more) to explain away the earlier 7 p.m. testimony; and whether his "records" disclose the content of the call. It may well be there was a phone call by the defendant to the witness Karras at 12 noon and a second call at 7 p.m. the same day. Even if the witness Karras had been recalled and allowed to testify that the phone call was received at 12 noon on the 19th, based on his "records," nonetheless the jury might have chosen to believe his earlier testimony where he said the conversation took place at 7 p.m. There is considerable difference in a sequence of events during a day between a noon lunch and a 7 p.m. dinner.

In *Cohen* it was held that a concededly erroneous failure by the State to disclose favorable evidence did not call for a new trial where disclosure would not in any reasonable likelihood have affected the verdict. Such is clearly the case here. The jury rejected the testimony of five alibi witnesses claiming continuous contact with defendant and each other on the day of the murder. On this record it would be highly unlikely that the testimony of another friendly witness, Karras, who might state that he received a phone call from the defendant at noon that day, would create a reasonable

likelihood that would have affected the judgment of the jury in making their decision.

The defendant's motion for a new trial was properly denied.

ISSUE 4: The jury was properly instructed that the defendant could be found guilty of homicide as an aider or abettor.

■ A case similar to the subject case on the facts is *State v. Taplin,* 9 Wn. App. 545, 547, 513 P.2d 549 (1973), wherein the jury was instructed that the defendant Taplin could be found guilty as a principal or accessory, even though he was the only one charged. The court reasoned:

> Taplin next assigns error to the instruction which was given on aiding and abetting, contending that there was no evidence to support it. It is true that, if there is no proof that anyone else committed the offense, the giving of an aiding and abetting instruction may be prejudicial error. *State v. Nikolich,* 137 Wash. 62, 241 P. 664 (1925). However, there was sufficient evidence to warrant the giving of the instruction. Ms. Estill was in close proximity to the scene of the crime when it was committed, she was a passenger in the car in which the stolen property was probably transported, and she occupied the motel room in which the property was subsequently found. This establishes a prima facie case of burglary against her and justifies the giving of the instruction. *State v. Frazier,* 76 Wn.2d 373, 456 P.2d 352 (1969); *State v. Razey,* 54 Wn.2d 422, 341 P.2d 149 (1959).
>
> The defense seems to argue that there was no evidence implicating Ms. Estill in the commission of the crime because, with Taplin seen at the doorway, it is obvious that, as between the two, Taplin did it. The evidence as to the person or persons entering the apartment was entirely circumstantial. The jury could not know absolutely whether it was Taplin, Ms. Estill, or both, or someone else. It is enough under the statute, RCW 9.01-.030, that there be substantial evidence, which there was, that Taplin participated either as principal or accessory. *State v. Nichols,* 148 Wash. 412, 269 P. 337 (1928).

(Footnote omitted.)

The case of *State v. Carothers,* 84 Wn.2d 256, 525 P.2d 731 (1974) is also factually very close to the subject case. There one Joseph Lalak was involved in an automobile accident in Bellingham and when he ran from the scene carrying a gun and a holster which he dropped on the ground as the officers apprehended him, it turned out that the gun belonged to a Ronald Buck who, along with his wife, had been murdered in their home several months previously. After telling a number of obviously false stories about his acquisition of the revolver, Lalak was granted immunity by a special inquiry judge and then testified that he and the petitioner perpetrated these crimes, the petitioner doing the actual shooting and the taking of the property of the victim and Lalak assisting him by keeping a lookout. The petitioner was charged with two counts of murder in the first degree and one count of robbery.

The petitioner first maintained that the Court of Appeals should have set the judgment of the verdict aside for error in giving an instruction on aiding and abetting. The court answered this contention at pages 260–61:

> The law is settled in this jurisdiction that a verdict may be sustained upon evidence that the defendant participated in the commission of the crime charged, as an aider or abettor, even though he was not expressly accused of aiding and abetting and even though he was the only person charged in the information. *State v. Frazier,* 76 Wn.2d 373, 456 P.2d 352 (1969); *State v. Brown,* 75 Wn.2d 611, 452 P.2d 958 (1969). Dictum in *State v. McCaskey,* 55 Wn.2d 329, 347 P.2d 895 (1959), indicating that this court subscribes to the view that when only one person has been indicted for a felony he cannot be convicted of aiding and abetting, was impliedly disavowed in *State v. Brown, supra,* and was expressly rejected in *State v. Frazier, supra.* That view is out of harmony with the expressed intent of RCW 9.01.030, which provides, *inter alia,* that every person concerned in the commission of a felony, whether he directly commits the act constituting the offense or aids and abets in its commission, is a principal and shall be proceeded against and punished as such.

The petitioner was charged as principal upon two counts of premeditated murder and felony murder (robbery) and one count of robbery. The evidence concerning the condition of the bodies and the premises established beyond any doubt that such crimes had been committed. The only question was whether the petitioner was guilty of them. The jury may have found reason to doubt the testimony of Lalak that he was only a passive participant and that the petitioner held the gun, pulled the trigger, and took the wallet and revolver belonging to the victims. At the same time it could find entirely credible his testimony that the petitioner participated in the crimes and his admission of his own involvement, particularly since there was corroborative evidence of these facts.

The jury was not required, as suggested by the petitioner, to accept the testimony of Lalak in toto or reject it all. It could reasonably infer that he was telling the truth when he said that the petitioner participated in the crimes, but that he was not accurately describing the events as they occurred and that he himself most probably played a more active role than he was willing to admit. The jury was not obliged to decide who held the gun or who committed the physical act of taking possession of the property of the victims.

(Footnote omitted.)

In the subject case it must be remembered that the State possessed no direct eyewitness testimony on the commission of the killing by Sutherland, nor any admissions by him to that effect. The defendant and the still living victim were placed at the apparent scene of the killing by Brian Gjerde, and to a lesser positive extent by Duane Bradley and Richard Wright sometime before noon on the 19th. Gjerde then provided the testimony as to the physical condition of his home and the acts, remarks and conduct of the defendant which could lead the jury to conclude that Eric Brankey's death occurred there and Sutherland participated in it. The jury could well have believed all of Gjerde's testimony as to the defendant's participation in the murder. However, they could have found that he had lied as to his own participation and perhaps they believed that

Gjerde actually killed Brankey and was aided and abetted by Sutherland.

Applying the rationale of *Taplin* and *Carothers* to the subject case, we conclude that instructions Nos. 18 and 19 were proper.

ISSUE 5: Instruction No. 20 dealing with unanimity of jury was proper.

██ Defendant also assigns error to the giving of court's instruction No. 20 on the basis of a claimed lack of requisite unanimity. This legal argument, however, was not presented to the trial court; its exception was taken but the examination of the argument discloses that the exception dealt only with the factual sufficiency issue previously discussed. It is well settled that legal arguments regarding sufficiency of instructions not presented to the trial court may not be first presented on appeal. *State v. Warwick,* 16 Wn. App. 205, 555 P.2d 1386 (1976).

Even assuming the issue was properly raised, it is specifically answered by *State v. Carothers, supra.* The court noted at pages 264–65:

> In this case, it was necessary for the State to prove that the alleged crimes were committed—that is, that the victims were shot with premeditated design and/or in the perpetration of a robbery. It further was necessary for it to prove that the petitioner had participated in one or more of the crimes charged. The jury by its verdict found that he had participated in all of them.
>
> . . .
>
> The Court of Appeals was correct in holding that, under the provisions of RCW 9.01.030, it matters not that some jurors may have believed that the petitioner fired the gun, while others may have believed that his only role was in aiding and abetting Lalak, so long as all twelve agreed that he did participate, a finding which their verdict clearly reflects.

We hold the court's instruction No. 20 was proper.

ISSUE 6:

The defense claims prosecutory error in making this remark to the jury: "Not one word from the defense witnesses in this case discussing that luggage, how it got there, why it was there, or the car. Not one witness at all."

The defense contended that the prosecutor was referring to the defendant's not testifying—stating: "Clearly, the only defense witness who could have shed any light on this issue was the defendant himself, as he was the only person who allegedly brought the luggage to Olympia."

■ This is simply not true, as a number of persons could have testified as to how the victim's luggage got there, *i.e.*, the owners of the Olympia house where the luggage was taken, or Ms. Thomas, or any number of the five alibi witnesses who testified they were with defendant all day March 19.

*See also State v. Ashby*, 77 Wn.2d 33, 38, 459 P.2d 403 (1969).

The rule enunciated by this court in *State v. Litzenberger*, 140 Wash. 308, 248 P. 799 (1926), that "Surely the prosecutor may comment upon the fact that certain testimony is undenied, without reference to who may or may not be in a position to deny it; and, if that results in an inference unfavorable to the accused, he must accept the burden, because the choice to testify or not was wholly his" is still good law.

We find no prosecutory error.

We find defendant's other assignments of error to be without merit.

Affirm.

SWANSON, A.C.J., and FARRIS, J., concur.

Reconsideration denied November 29, 1979.

Review granted by Supreme Court February 15, 1980.