**Raymond QUICK, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**William Thomas JACKSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**In the Matter of T. M., a Minor Child, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. 3298, 3462 and 3463.**

Supreme Court of Alaska.

Sept. 7, 1979.

William G. Royce, Christianson, Royce & Stahla, Sitka, for petitioner Quick.

Harold M. Brown, Ziegler, Cloudy, Smith, King & Brown, Ketchikan, for appellant Jackson.

Richard Yospin, Asst. Public Defender, Ketchikan, and Brian Shortell, Public Defender, Anchorage, for appellant T.M.

Geoffrey G. Currall, Dist. Atty., Ketchikan, and Avrum M. Gross, Atty. Gen., Juneau, for respondent and appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

William Thomas Jackson, Raymond Quick, and T.M., a minor, seek review of rulings made by the superior court in Ketchikan regarding the admissibility and use of confessions made by them to the Ketchikan police. Subsequent to these rulings Quick filed a petition for review, Jackson pleaded *nolo contendere* to charges of manslaughter and burglary in a dwelling, and T.M. was adjudged a delinquent after a trial on charges of attempted robbery, manslaughter, and burglary in a dwelling. Jackson also appeals the sentence which resulted from his plea. The facts are as follows:

On April 25, 1976, police in Ketchikan responded to a request for an ambulance at the apartment of Jones George Yeltatzie, aged 79. There the police found Raymond Quick, who indicated that Yeltatzie was his grandfather, and Yeltatzie, who was lying dead beside his bed. At the time the police considered the death to have been from natural causes, and no further investigation was made.

The next day, however, the police received a telephone call from P.F., aged fifteen, who said that she had witnessed two men beating a third older man the previous evening in the vicinity of Yeltatzie's apartment. P.F. went to the police station on April 27, and was interviewed there by police officers. She indicated that she had been walking with T.M. when she saw two men, whom she identified as Raymond and Allen Quick, beating an old man. After knocking the older man unconscious, the two had dragged him into the Alaska Building. P.F. and T.M. then ran home. That

same day it was learned that Quick was not Yeltatzie's grandson, contrary to what he had told police.

On April 29, Lt. Leighton, the officer in charge of investigations, asked Detective Dale Young, Juvenile Officer for the Ketchikan Police Department, to speak with T.M. regarding P.F.'s statement. It is clear that the police believed that the events described by P.F. might be connected to Yeltatzie's death. There was, however, no evidence or indication that T.M. was anything but a witness to these events.

Detective Young went to Revilla High School to speak to T.M. He was unable to locate T.M. and left word with the school principal that he wanted to talk with him. About an hour later, T.M. arrived at school, learned that Young had been looking for him, and asked the principal to drive him to the police station. There T.M. was interviewed by Young about the events of April 25. Young testified in his deposition that he told T.M. that:

> [H]e wasn't in any trouble that we knew of. All we wanted to know was what he had seen that night.
>
> Q. O.K. And basically he didn't have anything to worry about, he was just a witness to what somebody else did?
>
> A. Right.

T.M. then told Young that he had been too drunk that evening to remember anything, including whether he had even been with P.F. The conversation lasted about ten minutes, and then Young drove T.M. back to school. On the way, Young told T.M. that he might be asked to come back down to the police station later for more questions.

When Young reported the results of his interview to Lieutenant Leighton later that morning, Leighton was dissatisfied and asked that T.M. be brought back in for another interview. According to Lt. Leighton:

> I just wanted to get more information than that, he was just drunk and stuff like that. [P.F.] had said that he was there, that she was with him, he witnessed this, and I wanted a little bit more

than just saying I don't know, I didn't see anything, I was too drunk, and I don't recall being with [P.F.] I wanted to find out where he was if he wasn't with [P.F.] I couldn't just let it hang like that.

Young called the school, got permission from the principal, drove to the school and picked up T.M.

T.M. was re-interviewed in Lt. Leighton's office. The office is approximately twelve feet by twelve feet. The door was closed. Present at the interview were Lt. Leighton, Detective Young, and Detective Varnell, who was also assigned to the Yeltatzie case. It is agreed that no one informed T.M. that he was free to leave at any time if he desired. The officers again questioned T.M. about what he had seen and were he had been, and received non-committal answers to the effect that he had been too drunk to remember. After a few minutes Lt. Leighton and Detective Varnell left the room to discuss the situation. They both agreed that T.M. was withholding information, but believed this was because he was afraid of retaliation from those who had beaten the old man. When Leighton and Varnell returned, Leighton began asking questions in a more aggressive manner. In his deposition Leighton stated:

> A. All right, when I went back in the office I told him, I says, I don't think you're telling us the truth, we're conducting a murder investigation and I feel you're withholding any information or evidence, something along that line.
>
> Q. And that he could get into a lot of trouble?
>
> A. I believe I said that, yes.

Leighton then announced that he was going to contact P.F. and left the office to do so. Varnell stated in his deposition that he then asked T.M.:

> A. [A]re you scared, or are you afraid somebody is going to retaliate, those type of things.
>
> Q. What was his response?
>
> A. He indicated that yes, he was afraid that somebody was going to get him.

And I said, well, what are you afraid of, why would you be afraid they're going to get you. If you give us the information we're not going to tell them you gave it to us, first of all, and secondly, we'll go out and get them and arrest them and put them in jail. And that's when he made the statement if I told you what I knew, I'd be an accessory to murder.

As he made this statement, T.M. began to cry. The officers immediately told T.M. to stop talking. They then turned on a tape recorder and advised him of his rights. T.M. then confessed that he had participated in the assault on Yeltatzie, and named Raymond Quick and "Ben Quick" as Yeltatzie's murderers. Raymond Quick was then arrested and subsequently confessed to participating in the murder, naming William Jackson, rather that "Ben Quick," as the third participant in the murder. Jackson was then arrested and also made a confession.

The defendants filed several pre-trial motions. First, they asked that T.M.'s confession be suppressed as being the product of illegal coercion and thus in violation of T.M.'s constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964). Jackson and Quick maintained that Criminal Rule 26(g)[1] gave them standing to assert T.M.'s constitutional rights. They also requested suppression of Jackson's confession arguing that it had been obtained in violation of Jackson's *Miranda* rights. When T.M. agreed to testify for the state against the adult defendants, Jackson and Quick moved for a protective order prohibiting his testimony. Finally,

Quick and Jackson requested separate trials.

In a carefully detailed and well reasoned memorandum decision, the superior court denied the motions of Jackson and Quick to prohibit use of T.M.'s confession or testimony at their trials. The court assumed for the purposes of the defendant's motion that T.M.'s statement had been illegally obtained, but held that Rule 26(g) did not prevent the statement from being used against codefendants because any violation of T.M.'s rights had been inadvertent. The court also found the confession of William Jackson to have been properly obtained and refused to suppress it.

The judge denied the motions of Jackson and Quick to sever their trials. To avoid possible constitutional problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the court indicated that certain deletions would be made from each defendant's confession before being admitted at trial. On the same day the superior court judge held an evidentiary hearing on the circumstances surrounding T.M.'s confession. At the conclusion of the hearing the court found that the confession was voluntary and ruled that it could be used against T.M.

■ Following these rulings, Quick filed a petition for review and Jackson pleaded *nolo contendere* to the charges of manslaughter and burglary in a dwelling. Jackson stipulated with the state that certain issues had been reserved for appeal to the supreme court under the doctrine announced in *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974).[2]

1. Criminal Rule 26(g) provides:

 (g) *Evidence Illegally Obtained.* Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness.

2. An immediate jurisdictional question is raised with respect to appellant Jackson because of the case of *Oveson v. Municipality of Anchorage,* 574 P.2d 801 (Alaska 1978). In *Oveson* we modified the doctrine announced in *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974), which held that appeals would be allowed from pleas of *nolo contendere.* The court in *Oveson* ex-

plained that such an appeal would be permitted only if the defendant's plea was explicitly conditioned on the reserved right to appeal, and only if the issue reserved for appeal was one that would be dispositive of the entire case.

In the instant case the first requirement was satisfied by Jackson when he expressly conditioned his plea on the right to appeal. We will not apply the second requirement here because the plea was entered almost nine months prior to *Oveson.* Jackson based his plea of *nolo contendere* on the right to appeal. Denying him that right at this point would raise serious questions about the voluntariness of his plea.

On April 5, 1977, T.M. was adjudged a delinquent following a jury trial and appealed to this court. T.M.'s appeal was consolidated with Jackson's appeal and Quick's petition for review on July 26, 1977.

I

### T.M.'S CONFESSION

The first issue on appeal is whether T.M.'s confession was obtained in violation of his *Miranda* rights. Two possible violations have been raised by the appellants and petitioner. First, they contend that T.M. was in a custodial situation and was pressured into making the inculpatory statements that led to his subsequent confession. It is their position that T.M. should have been warned of his rights at the time he arrived at the station for his second interview with police on April 29. Second, they argue that, even after T.M. was informed of his rights, his subsequent waiver of those rights was ineffective.

A. Was T.M. "In Custody?"

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that confessions obtained as the result of a custodial interrogation would be inadmissible unless obtained following a knowing, voluntary and intelligent waiver of the declarant's constitutional rights. We articulated the test we will follow in defining "custody" in our recent decision in *Hunter v. State,* 590 P.2d 888 (Alaska 1979). There we stated that we would find a custodial situation if an objective "reasonable person" placed in the shoes of the defendant would believe that he had been deprived of his freedom in any significant way.

The custody determination must be made on a case-by-case basis, but the inquiry, as expressed by the court in *United States v. Hall,* 421 F.2d at 545, is whether:

*See Hunter v. State,* 590 P.2d 888, 892 (Alaska 1979).

in the absence of actual arrest something . . . [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.

*Id.* at 895, *quoting United States v. Hall,* 421 F.2d 540, 545 (2d Cir. 1969) (footnote omitted). In making this determination we will examine the manner and scope of the actual interrogation, events which took place before the interrogation, including those which explain how and why the defendant came to the place of questioning, and, where relevant, what happened after the interrogation. *Id.* at 895.

Applying the test to this case we conclude that T.M. was not in custody when he made his original incriminating statement. It is undisputed that T.M. was not formally under arrest when the questioning began. Although he was in a police station, he appeared there voluntarily. Earlier in the day, after learning that the police were looking for him, he had been driven to the police station at his request by the principal of the school. There he was told by Officer Young that he was not under arrest, and that he was being asked questions only because he had been named as a witness. While being driven back to school, he was told that he might be asked more questions later, and within a short time he was asked to return.[3] The questioning lasted only a few minutes before T.M. confessed.

The conclusion that T.M. was not in custody is bolstered by T.M.'s own testimony about the questioning.

Q. Did you feel—did you think at this time, when you first walked in [to Lt. Leighton's office for the second interview] and started talking to these people, that anything you said could lead to your being arrested? Or did you feel that you'd be allowed to walk out of there?

3. Officer Young came for him and drove him to the police station. There was no indication, however, of his being ordered to accompany Officer Young.

A. I felt that I'd be able—be free to walk out.

Q. And why did you feel that way?

A. Officer Young had told me so, before—before we'd talked, on our way down.

Q. Okay. And were you still under the impression that that applied, that that was still the rules that applied at that point?

A. Yes.

The trial court appeared satisfied that the police had not created a coercive atmosphere during their questioning of T.M.[4] The court also concluded, and the record clearly supports the conclusion, that prior to T.M.'s confession the police had no knowledge or suspicion that T.M. was involved in the case as anything other than a witness. Under the test laid down in *Hunter* we conclude that T.M. was not in custody prior to when he made his first inculpatory statements.

**B. Was T.M.'s Waiver of His *Miranda* Rights Knowing and Voluntary?**

As soon as T.M. stated that he might be an accessory to murder, he was in custody, as at that point he was clearly no longer free to leave. The detectives immediately stopped him from saying anything further and read T.M. his *Miranda* warnings. T.M. waived his rights, and the detectives, after further questioning, obtained a lengthy confession. T.M. now contends that his waiver was invalid.

In *Miranda* the Supreme Court held:

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

We have held that the state can meet that burden if it shows the confession was voluntary by a preponderance of the evidence.[5] In determining voluntariness the court must look to the totality of the circumstances.[6]

T.M., Jackson and Quick argue that because T.M. was a juvenile his waiver was ineffective, as he was not given an opportunity to consult with a neutral adult or guardian before waiving his rights. It is their position that "a child when faced with a decision about whether to waive his privilege against self-incrimination and the right to counsel, should have the informed guidance of an informed adult."

The issue of whether and to what extent a juvenile can waive *Miranda* rights without the guidance of an adult has been raised in many states. The rules these states have followed range from a *per se* prohibition on

---

4. I don't think there was a 'game'—but however you want to characterize it, whether one guy decided to play the heavy and the other guy was just going to be quiet, or whether they were playing 'Mutt and Jeff' or whatever, it wasn't—I do make the finding, it wasn't much of a game; they didn't push it very far and it didn't last very long.

 . . . . .

 In listening particularly to the beginning of the tape—granted that the kid was upset before the tape was turned on, I think he was upset as much by his realization of the fact of—you know, of what had happened and that he was in trouble, as [by] anything Lt. Leighton said to him. You listen to his voice on the stand this afternoon and—I'm willing to accept that he was nervous; but he certainly wasn't upset to the point, I don't think, where he'd—his ability to evaluate his position was destroyed. And if it was impaired in any way, it was impaired by—as much by, I think, his realization of where he was, in terms of the incident of the 25th of April, as by anything that Lieutenant Leighton said or did. Overall, I can't fault the police for their handling of that interview. . . .

5. *Hampton v. State*, 569 P.2d 138, 141 n.6 (Alaska 1977); *Schade v. State*, 512 P.2d 907, 917 (Alaska 1973); see *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Peterson v. State*, 562 P.2d 1350, 1363 (Alaska 1977).

6. *Ladd v. State*, 568 P.2d 960, 967 (Alaska 1977); *Schade v. State*, 512 P.2d 907, 916 (Alaska 1973); see *Hampton v. State*, 569 P.2d 138, 141 (Alaska 1977); *Peterson v. State*, 562 P.2d 1350, 1363 (Alaska 1977).

waivers unless a fully informed adult has been present [7] to a "totality of the circumstances" test in which the age of the defendant is an important but not decisive factor.[8]

In the recent case of *Fare v. Michael C.*, —— U.S. ——, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the United States Supreme Court held that a request by a juvenile to see his probation officer was not an assertion of *Miranda* rights. In finding that the subsequent confession was voluntary, the Court explicitly approved use of the totality of the circumstances test in juvenile waiver cases.

> This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.* at ——, 99 S.Ct. at 2572, 61 L.Ed.2d at 212.

Although we have never addressed the question directly, our decisions regarding juvenile waivers are in line with this recent Supreme Court decision. We rejected a *per se* rule regarding juvenile waiver of a jury trial in *R.L.R. v. State*, 487 P.2d 27 (Alaska 1971). There we stated:

> The age of majority statute does not imply a legislative judgment that infants are incompetent in all things; it means only that persons above the statutory age minimum are competent in all things except as otherwise provided.

*Id.* at 34. We defined a waiver as " 'an intentional relinquishment of a known right or privilege,' which is 'knowingly and intelligently' made," and we held that this definition was applicable to infants as well as adults. *Id.* at 33, *quoting Hammonds v. State*, 442 P.2d 39, 42 (Alaska 1968).

■ The mere fact that a person is under the age of majority does not automatically render him incapable of making a knowing and voluntary waiver. The surrounding circumstances must be considered in each case to determine whether a particular juvenile had sufficient knowledge and maturity to make a reasoned decision. Among the factors to be considered are age, intelligence, length of the questioning, education, prior experience with law enforcement officers, mental state at the time of the waiver, and whether there has been any prior opportunity to consult with a parent, guardian, or attorney.[9]

■ It is unquestionably a better practice to see to it that a juvenile consults with an adult before he waives his *Miranda* rights, but, at least in those cases where it has not been requested, we decline to adopt

---

7. *See, e. g., Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138, 142 (1972); *State in Interest of Dino*, 359 So.2d 586, 594 (La.1978); *In re K.W.B.*, 500 S.W.2d 275, 283 (Mo.App.1973); *Commonwealth v. Jamison*, 474 Pa. 541, 379 A.2d 87, 89 (1977).

8. *See, e. g., State v. Jackson*, 118 Ariz. 270, 576 P.2d 129, 131 (1978); *People v. Lara*, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202, 215 (1967); *Riley v. State*, 237 Ga. 124, 226 S.E.2d 922, 926 (1977); *State v. Young*, 220 Kan. 541, 552 P.2d 905 (1976); *State v. Gullings*, 244 Or. 173, 416 P.2d 311, 315 (1966); *State v. Luoma*, 88 Wash.2d 28, 558 P.2d 756, 761 (1977). The "totality of the circumstances" test is the majority rule. *See* ALI Model Code of Pre-Arraignment Procedure, Commentary to § 140.6, at 361–63 n.4 (1975).

9. *Fare v. Michael C.*, —— U.S. ——, ——, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 211 (1979). *See Peterson v. State*, 562 P.2d 1350, 1363 (Alaska 1977); *cf. Gregory v. State*, 550 P.2d 374, 380 (Alaska 1976) (court can be certain that defendant's waiver of counsel at guilty plea hearing is voluntary only after examining circumstances under which the plea is made, including mental condition, age, education, experience, complexity of the case, and other factors).

a rule requiring such consultation. The state has always had the burden of proof to show that a waiver was knowing and voluntary.[10] Where a juvenile is concerned, the burden on the state is even heavier than it would be with an adult.[11] We believe that the careful scrutiny to be afforded an unsupervised waiver is sufficient to ensure that the rights of a juvenile suspect will be safeguarded.

■ In this case the trial court conducted a lengthy and detailed hearing into the circumstances surrounding T.M.'s waiver. T.M. testified that, immediately after he told the detectives that he might be an accomplice to murder, they stopped him from saying anything further, turned on a tape recorder and informed him of his *Miranda* rights. T.M. was then given a copy of the standard waiver form, which contains the text of those rights, and was asked to read it. He did so and then signed the form in two different places. The court's questioning revealed that T.M. understood the warnings he was given.

At the time of the questioning T.M. was seventeen years old. He had been involved

with police officers and the juvenile court system on several prior occasions. He was attending Revilla High School in Ketchikan. T.M. was questioned by several detectives but had been told truthfully that he was being questioned merely as a possible witness and that he was not believed to be in any trouble. T.M. himself testified that he believed he would be free to leave. The interrogation continued only a short time before T.M. confessed.

■ The trial court concluded, after considering these points, that T.M.'s waiver had been knowing and voluntary. After reviewing the record carefully we believe that there was enough evidence to support this conclusion and hold that the trial court did not err in ruling the confession admissible.[12]

## II

## ADMISSION OF THE TAPE RECORDING

■ T.M. also claims that the tape recording of his confession is inadmissible because the tape machine was turned off for

---

10. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966); *Tarnef v. State*, 512 P.2d 923, 934–35 (Alaska 1973).

11. *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967); *R.L.R. v. State*, 487 P.2d 27, 34 (Alaska 1971). In *Gault* the United States Supreme Court, in holding that the privilege against self-incrimination extended to juveniles, stated:

 If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

12. Aside from the arguments made about T.M.'s age, T.M., Jackson and Quick advance two other theories for why T.M.'s waiver is invalid. First, they argue that the confession was the result of the inculpatory statement he gave to the police prior to being given the *Miranda* warnings. This court has recognized that a subsequent confession obtained after an involuntary one may be inadmissible. Once having given inculpatory statements to the police, a defendant may feel he has nothing to

lose by making further damaging statements. However, our holding that T.M.'s original statement was not impermissibly seized disposes of this contention. *Hampton v. State*, 569 P.2d 138, 144–45 (Alaska 1977).

Second, T.M., Jackson and Quick argue that the waiver was invalid because the police told T.M. that telling the truth would "help him" and "not hurt him" while they were reading him his rights. Any promise or threat made by a police officer to a suspect that is a motivating cause for the waiver of *Miranda* rights will automatically render the waiver involuntary. *Miranda v. Arizona*, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966). We make a distinction, however, between mere exhortations to tell the truth and promises of leniency or better treatment. *Thessen v. State*, 454 P.2d 341, 347 (Alaska 1969); *see United States v. Barfield*, 507 F.2d 53, 56 (5th Cir. 1975); *United States v. Springer*, 460 F.2d 1344, 1347 (7th Cir. 1972); *People v. Hill*, 66 Cal.2d 536, 58 Cal.Rptr. 340, 426 P.2d 908, 916 (1967). It is evident from the transcript of the confession that the statements made by the detectives fall in the former category. The detectives expressly told T.M. that they could not legally make any promises to him. Their statements do not invalidate the waiver.

several brief periods during his interview. The general rule is that a recording is admissible unless the omissions are so substantial as to render the recording untrustworthy.[13] No such allegation has made made here. T.M. merely asserts that allowing an incomplete recording to be admitted into evidence causes the jury to unduly emphasize the portions of the conversation taped. We find the argument without merit.[14]

## III

### JACKSON'S CONFESSION

■ After T.M. confessed, the police arrested Raymond Quick. He confessed and told police that William Jackson had been the third participant in the Yeltatzie murder. Jackson was then also arrested. He also confessed and now challenges the legality of his statement.

There is a factual disagreement about what happened when Jackson was taken to the police station. Both the police and Jackson agree that after he was warned of his rights he requested a lawyer. The police then stopped the questioning and began making arrangements to have Jackson transported to jail. Jackson claims that, after all but one of the police officers had left the room, the remaining officer asked him for a cigarette. After giving him one, Jackson asked, "Has Ray talked yet?" The police officer then said, "Yes, but we're pretty much in the dark yet," and asked if Jackson wanted to "clear that up." The police version is that, after the rest had left, Jackson said to the remaining officer, "I didn't mean to kill him it was their idea." When asked if he had changed his mind about giving a statement, he said he had.

The transcript of Jackson's confession reveals that the police then reentered the room and asked him, "Now do you want to talk about this thing or not?," to which Jackson replied, "I'll tell you what I know."

The trial court ruled that the subsequent confession was admissible without deciding which version of the preceding events was correct. Jackson now argues that the waiver was invalid because the police continued questioning him after he had requested a lawyer.

In *Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975), the Supreme Court held that police could resume questioning a suspect after he asked for an attorney so long as they scrupulously honored his right to cut off questioning. In that case the Court found persuasive the fact that the police had immediately stopped the interrogation when the defendant asked for a lawyer and had waited several hours before asking the defendant further questions about an unrelated matter.

In *Ladd v. State*, 568 P.2d 960 (Alaska 1977), we discussed the proper approach for determining whether a waiver was voluntary if the defendant has first asked for an attorney but then changed his mind when confronted with incriminating evidence. There we said:

> California takes the position that a confession elicited in any manner by the police, no matter how gentle the inquiry, is inadmissible under *Miranda* after a request has been made to see an attorney. Such a view facilitates the determination of whether police conduct has violated an accused's constitutional rights since only statements obtained from defendants who on their own initiative volunteer to talk to police would be admissible. However, we feel that this position circumscribes too narrowly the permissible scope of interrogation. Therefore we decline to adopt such a broad rule, and will instead carefully scrutinize the particular facts before us.

*Id.* at 966 n. 8 (citations omitted).

Even assuming that Jackson's version of events is correct, we believe that the con-

13. *Hampton v. State*, 569 P.2d 138, 146 (Alaska 1977); *Bentley v. State*, 397 P.2d 976, 978–79 (Alaska 1965); *see* Annot., 57 A.L.R.3d 746, 749 (1974).

14. Because we hold that T.M.'s confession is admissible, we need not discuss whether Jackson and Quick had standing to challenge it under Criminal Rule 26(g).

fession was valid under the tests laid down in *Mosley* and *Ladd*. It is undisputed that the police immediately stopped questioning Jackson as soon as he requested an attorney. The renewed conversation was initiated by Jackson who, according to his version of events, asked whether Ray Quick had talked. Jackson testified that the knowledge that Quick had talked "really broke me up." The transcript indicates, however, that the police asked him again before questioning whether he wanted to proceed. He indicated he was willing to do so. The police actions were entirely reasonable under the circumstances, and we agree that Jackson's statement was admissible.

## IV

### REQUEST FOR SEVERANCE

On September 10, 1976, the state served notice that it intended to use the confessions of Jackson and Quick at their joint trial and filed a motion to conform statements in the confessions to the *Bruton* rule. The state recommended that references to the other defendant be excised from each defendant's confession. The state argued that, if properly modified, the confessions could be admitted at a joint trial. The defendants opposed the motion, and on December 27, 1976, Jackson filed a motion for relief from prejudicial joinder based on claimed violation of his sixth amendment rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[15]

On February 15, 1977, the superior court denied the motion for severance, finding that "[t]he showing of prejudice made by

the defendants is insufficient in my view, to warrant severance of the trials." The court held a hearing on the specific excisions proposed by each party, but before it could rule on these, Jackson pleaded *nolo contendere*, and Quick filed his petition for review. If Jackson's plea stands, Quick's petition on this point is moot, for he is the only defendant left to try.

In *Bruton*, the Supreme Court held that in a joint trial the introduction of inculpatory admissions by a codefendant who did not take the stand violated the sixth amendment rights of the defendant, who was thus unable to cross-examine. The rationale for this holding was two-fold: first, the Court believed that a codefendant's statements would "[add] substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination" because there was a substantial likelihood that a jury would use the codefendant's admission when considering the guilt or innocence of the defendant.[16] Second, the court stressed that the confession of a codefendant was inherently unreliable and that cross-examination was essential so that the truth of the codefendant's statements could be tested before the jury.[17] The Alaska Supreme Court has frequently discussed the *Bruton* rule.[18]

The *Bruton* rule does have recognized exceptions. In *Sidney v. State*, 468 P.2d 960, 963 (Alaska 1970), we refused to apply the rule to the confession of a codefendant who testified at trial, reasoning that the opportunity for cross-examination nullified any claimed lack of a right to confrontation.[19] Similarly, in *P.H. v. State*, 504 P.2d

---

**15.** U.S.Const. Amend. VI states in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . ..

Alaska Const. art. 1, § 11 provides in pertinent part:

> [T]he accused is entitled . . . to be confronted [by] the witnesses against him . . ..

**16.** *Bruton v. United States*, 391 U.S. 123, 127, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476, 480 (1968).

**17.** *Id.* at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

**18.** *See, e. g., Benefield v. State*, 559 P.2d 91, 95 (Alaska 1977); *Lemon v. State*, 514 P.2d 1151, 1156 (Alaska 1973); *Mead v. State*, 504 P.2d 855, 857 (Alaska 1972). *See also Blue v. State*, 558 P.2d 636, 645 (Alaska 1977), *Whitton v. State*, 479 P.2d 302, 315 (Alaska 1970).

**19.** *See also Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

837, 843 (Alaska 1972), we held that the testimony of a kidnapping victim as to what the codefendants had said was admissible under the circumstances of the case under a recognized exception to the hearsay rule.[20] Most recently, in *Benefield v. State*, 559 P.2d 91, 95 (Alaska 1977), we held that police officers' testimony about a statement made by a codefendant that was in no way inculpatory did not violate the confrontation clause.

The state urges that we recognize yet another exception where the confessions of both codefendants are to be introduced at the same trial and both confessions contain identical or factually similar admissions. This so called "interlocking confessions" exception to the *Bruton* rule was recently endorsed by a plurality of the United States Supreme Court in *Parker v. Randolph*, ── U.S. ──, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). The rationale for the exception is that the admission of a codefendant's factually similar statements will always be harmless where the defendant's own admissions will be admitted at the same trial.[21] In *Parker* the Court reasoned that:

> the incriminating statements of a codefendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the "constitutional right of cross-examination," *id.* [391 U.S.]

at 137, 88 S.Ct. [1620] at 1628, [20 L.Ed.2d 476]—has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence. Successfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged.

*Id.* at ──, 99 S.Ct. at 2139, 60 L.Ed.2d at 723. The court further stated that, where there were interlocking confessions, instructions to the jury not to use the confession of one defendant against the other would be sufficient to comply with requirements of the confrontation clause.[22] In this case, the superior court found that prejudice against the defendants would be minimal, especially in light of its ruling that direct references to codefendants would be excised.

▪ We are unable to conclude that the right to confrontation, as it is preserved in article I, section 11 of the Alaska Constitution, is never infringed when a codefendant's factually similar confession is admitted in a joint trial. The mere fact that the defendant has also confessed does not automatically render a codefendant's interlocking confession unimportant. We agree with Justice Blackmun, concurring in *Parker*, who stated:

> The fact that confessions may interlock to some degree does not ensure, as a *per*

---

**20.** *See also Dutton v. Evans*, 400 U.S. 74, 81–82, 91 S.Ct. 210, 216, 27 L.Ed.2d 213, 222–23 (1970). In *Dutton* the Court held that not every exception to the hearsay rule involves a violation of the confrontation clause. The Court prescribed a balancing test under which the nature of the evidence, the relationship of other evidence, the opportunity to examine the statement, and its importance to the central issue at trial would be considered to determine whether a violation occurred.

**21.** *Parker v. Randolph*, ── U.S. ──, 99 S.Ct. 2132, 60 L.Ed.2d 713, 723 (1979); *United States v. Walton*, 538 F.2d 1348, 1354 (8th Cir. 1976); *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 48 (2d Cir. 1975); *United States v. Spinks*, 470 F.2d 64, 66 (7th Cir. 1972); *United States ex rel. Catanzaro v. Mancusi*, 404 F.2d 296, 300 (2d Cir. 1968).

**22.** When, as in *Bruton*, the confessing codefendant has chosen not to take the stand and the implicated defendant has made no extrajudicial admission of guilt, limiting instructions cannot be accepted as adequate to safeguard the defendant's rights under the Confrontation Clause. . . . But when the defendant's own confession is properly before the jury, we believe that the constitutional scales tip the other way. The possible prejudice resulting from the failure of the jury to follow the trial court's instructions is not so "devastating" or "vital" to the confessing defendant to require departure from the general rule allowing admission of evidence with limiting instructions.

── U.S. at ──, 99 S.Ct. at 2140, 60 L.Ed.2d at 724 (footnote omitted).

*se* matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The two confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does *not* take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking.

—— U.S. at ——, 99 S.Ct. at 2142, 60 L.Ed.2d at 727 (Blackmun, J., concurring). Although we have in the past been willing to find that error in admitting a codefendant's confession was harmless under the circumstances as they developed at trial, we have always held that the right of cross-examination and confrontation exists regardless whether the defendant's confession was admitted into evidence. In *Mead v. State,* 504 P.2d 855 (Alaska 1972), the confessions of three codefendants were admitted at the joint trial. In finding a violation of the right to confrontation, we stated:

> The only fact which distinguishes the case at bar from *Bruton* is that Mead's own confessions were admitted into evidence along with the confessions of his nontestifying codefendants. In our view, this circumstance does not appear to have any bearing on the fact that Mead was

denied the right to confront and cross-examine Henderson and Schott concerning their confessions, both of which implicated him in the burglaries. Henderson and Schott were in effect unavailable to testify since Mead could not compel them to take the stand. And Mead had no actual opportunity to cross-examine them since they did not take the stand.

*Id.* at 857. In *Mead* we found that the factual similarities between the confessions increased the likelihood that the jury would find the defendant's confession credible and truthful. We held that the likelihood that such corroboration had occurred precluded a finding of harmless error. *Id.* at 860.

In *Benefield v. State,* 559 P.2d 91 (Alaska 1977), we similarly found that testimony of a police officer about statements made by one defendant which incriminated the other defendant violated the right to confrontation. On the facts of the case, however, we determined that the error was harmless.[23]

 In the instant case no trial was held, so we are unable to say that the failure to sever inevitably would have proved harmless.[24] Admittedly, the inclination is strong to do so. Each defendant has confessed, and there is no question that each confession is voluntary and reliable, at least so far as it implicates the defendant in the crime. But that fact does not deprive each defendant of the right to a fair trial, and among the incidents of a fair trial are the rights of confrontation and cross-examination. Those rights may not be dispensed with merely because the probability of a

---

**23.** Although admission of this statement violated Benefield's right to confrontation as guaranteed by the United States and Alaska Constitutions, we hold that the error was harmless "beyond a reasonable doubt." Significantly, there was testimony that Benefield had stated "that he had been with Mr. Blue all evening and part of the afternoon and they had been out drinking." These statements were properly introduced to the jury. Since the contested statements were identical to Benefield's own admissions, it is unreasonable to conclude that Blue's statements influenced the verdict here. We therefore hold

that the admission of Blue's statement was harmless error.

559 P.2d at 95–96 (footnotes omitted).

**24.** Indeed, this issue is presented in disturbingly abstract form. We do not know how the confessions would have been edited. Further, we do not know what evidence would have been presented which might make the introduction of the codefendant's statements harmless. The situation is an apt illustration of the drawbacks of the procedure established in *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974), when it is unlimited by the conditions prescribed in

guilty verdict seems overwhelming.[25] We therefore decline to adopt a per se "interlocking confessions" doctrine as an exception to the Bruton rule under the Alaska Constitution.

The state argues that, even if the interlocking confessions doctrine is not adopted, the use of excision or "redaction" made joinder in this case acceptable. Federal courts have widely held that a codefendant's confession may be introduced so long as reference to other codefendants is deleted.[26] The objection to the use of this method is well stated by Jackson:

> It defies common sense to suggest that excision of direct reference to the respective codefendant relieves the proceedings from any suggestion that the person sitting next to the declarant is not the one referred to in declarant's statement. The use of an excised statement effectively nullifies defendant's constitutional rights to confrontation.

We agree that, even if the confessions are modified, they will inevitably be used by the jury against the respective codefendants. The two confessions are lengthy and detailed and closely resemble one another. Under these circumstances it seems virtually impossible that a jury would not relate Quick's confession—inadmissible against Jackson because of Bruton —to Jackson and vice versa, despite any attempts to change direct references to the codefendants to neutral terms.

The American Bar Association Standards Relating to Joinder and Severance § 2.3(a) (Approved Draft, 1968) suggest that:

(a) When a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court should determine whether the prosecution intends to offer the statement in evidence at the trial. If so, the court should require the prosecuting attorney to elect one of the following courses:

(i) a joint trial at which the statement is not admitted into evidence;

(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, provided that, as deleted the confession will not prejudice the moving defendant; or

(iii) severance of the moving defendant.[27]

Commentary on the standards suggests that "in a great many cases the deletion alternative simply will not be available, as it will be impossible to remove all references to participation of another person in the crime without changing materially the substance of the statement." Id. The essential contention of Jackson and Quick is that the lengthy and detailed confessions in this case fall within this class. We agree that they do and that the trials should have been severed.

On remand Jackson shall have the right to change his plea of nolo contendere to a plea of not guilty. If he or Quick so desires, a separate trial should be ordered. If Jackson does not wish to change his plea,

Oveson v. Municipality of Anchorage, 574 P.2d 801 (Alaska 1978). See note 2 supra.

**25.** A similar situation arose in United States v. Corbin Farm Serv., 444 F.Supp. 510 (E.D.Cal.), aff'd on other grounds, 578 F.2d 259 (9th Cir. 1978). There the trial judge, in declining to adopt the interlocking confessions exception, granted a pretrial motion for severance, stating:

> A number of these cases have deemed the admission of the confession "harmless error" based on the other evidence against the defendant, the lack of devastating incriminating information in the confession, or similar grounds. This court is unwilling to permit a joint trial on the assumption that the Ninth

Circuit would deem the admission of the statements "harmless error." Although such an error might be harmless in the eyes of the Ninth Circuit, it would still be an error. 444 F.Supp. at 540.

**26.** See, e. g., United States v. Hicks, 524 F.2d 1001, 1003 (5th Cir. 1975); United States v. Gay, 522 F.2d 429, 432 (6th Cir. 1975); United States v. Wilson, 500 F.2d 715, 721 (5th Cir. 1974).

**27.** See also Alaska Rule of Criminal Procedure 14, empowering the court to sever the trial or provide other relief that justice requires.

his counsel should promptly notify the Clerk of the Supreme Court and we will rule on his sentence appeal. The adjudication of T.M. as a juvenile delinquent is affirmed.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS.

BURKE, J., dissenting in part.

BURKE, Justice, dissenting in part.

I dissent from that portion of the majority opinion holding that Jackson was denied his sixth amendment right of confrontation,[1] thereby entitling him to withdraw his plea of *nolo contendere* and demand a separate trial.

In fact, no such denial has yet occurred. As noted by the majority,[2] the issue is presented in abstract form. We do not know how the confessions would have been finally edited for use at trial or, when introduced, what impact they might be said to have had when viewed in the light of the other evidence presented.[3] At this time we do not even know whether the confession of Jackson's codefendant would *in fact* have been offered at trial. Nor do we know, in that event, whether the codefendant would have taken the stand, thereby curing any *Bruton* problem under our holding in *Sidney v. State,* 468 P.2d 960 (Alaska 1970).

Also, since each defendant's own confession could be used against him, along with any other evidence of guilt, the decision not to allow introduction of his codefendant's confession would not be dispositive of the entire case. *See Oveson v. Municipality of Anchorage,* 574 P.2d 801, 803 n. 4 (Alaska 1978). This, together with the other considerations that I have mentioned, convinces me that there is no reason to reverse Jackson's conviction.[4]

In all but one of the cases relied upon by the majority, there had been a trial at which the statement or confession complained of was actually introduced. The one exception is *United States v. Corbin Farm Service,* 444 F.Supp. 510, 538–40 (E.D. Cal.), *aff'd on other grounds,* 578 F.2d 259 (9th Cir. 1978). In that case the trial judge, refusing to apply the "interlocking confessions" exception to the *Bruton* doctrine, granted a pretrial motion for separate trials. Here, there has been no trial. We cannot say with genuine certainty what evidence would have been introduced. Whatever right of confrontation either defendant has or had under the rule of *Bruton* could be exercised only in the future. Until then, it is impossible for me to say that that right has been denied him by the rulings of the superior court.

Having reached this conclusion, I am not required to accept or reject the "interlocking confessions" exception to the *Bruton* rule endorsed by a plurality of the Court in *Parker v. Randolph,* —— U.S. ——, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979).

For the reasons stated, I would affirm Jackson's conviction.[5] Quick's petition, in that event, would become moot. As to those issues addressed in parts I, II and III of the majority opinion, I concur.

---

1. The same guarantee is contained in Alaska Const. art. I, § 11.

2. *See* note 24 of the majority opinion.

3. The superior court, although never required to rule on the specific excisions proposed by each party because of Jackson's change of plea, indicated that, at least, all direct references to codefendants would be excised. Whether additional portions of either confession might eventually have been excised is unknown.

4. I am also influenced by the undisputed fact that each confession was voluntary and relia-

ble, at least so far as it implicates its maker in the crime.

5. The fact that a defendant's plea of *nolo contendere* may be rendered "unintelligent and invalid" by our refusal to respect an express reservation of the right to appeal a specific issue, *Cooksey v. State,* 524 P.2d 1251, 1256 (Alaska 1974), does not mean that the same is true where, as here, we have reviewed the issue, thereby honoring his reservation of the right to appeal, and conclude that a reversal is not required.