**Richard R. WATKINSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–6738.**

Court of Appeals of Alaska.

May 28, 1999.

---

Kathleen A. Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

Richard R. Watkinson was convicted, following a jury trial, of two counts of first-degree murder, an unclassified felony,[1] for killing his father and stepmother, Robert and Rosemary Watkinson. Following the conviction, Superior Court Judge Eric T. Sanders imposed a composite sentence of 100 years of imprisonment. On appeal, Watkinson argues that Judge Sanders erred in refusing to suppress statements which Watkinson made to the police. He also argues that his sentence was excessive. We affirm.

Shortly before midnight on November 30, 1995, police received a 911 phone call from the Watkinson residence on Upper Hillside in Anchorage. The caller, later identified as Robert Watkinson, said he had been shot and requested both police and medical attention. When the police arrived, they discovered Robert Watkinson lying in a pool of his own blood on the kitchen floor, and Rosemary Watkinson in a similar condition in the tub in the upstairs bathroom. Paramedics pronounced both victims dead at the scene. As police were searching the house, an alarm clock rang at approximately 1 a.m. The police also discovered a box of shells on Watkinson's bedroom floor and scattered live and spent shells in several rooms. The couple's son, Richard, was not in the house and could not be located.

After learning that Richard Watkinson attended Service High School, Alaska State Troopers Baty and Garrett went to Service High School the following morning to speak with school principal Marilyn Conaway.

1. AS 11.41.100(a)(1)(A).

They told her that Watkinson's parents had been killed, they had been unable to locate Watkinson in the intervening hours since the 911 call, and that they wanted to speak with him if he came to school.

A short time later, school authorities saw Watkinson at the school. They searched him for weapons and found several knives. Principal Conaway found out that Watkinson's mother lived in Oregon. In the presence of the troopers, Conaway asked Watkinson if he wanted to call his mother. Watkinson said no. Conaway then called Jean Roth, a friend of the Watkinson family who was listed in the school's records as an emergency contact person. Roth gave permission for the troopers to speak with Watkinson. Trooper Marrs then read Watkinson his *Miranda* [2] rights. Watkinson agreed to talk to the troopers.

Watkinson confessed to shooting both his father and stepmother the previous evening. Apparently an argument had ensued over Watkinson's behavior and the topic of who was to discipline him. Watkinson stated he was fed up with his parents' arguments and their attempts to control his life. Watkinson stated that he decided to wait until both Robert and Rosemary Watkinson were asleep, and then kill them. His original plan was to kill them at 1 a.m. on December 1, 1995. However, about an hour before that, Watkinson grabbed his rifle, walked upstairs, and shot Robert and Rosemary Watkinson who were not yet asleep. Watkinson then left the house and wandered around Upper Hillside until he went to school the following morning.

Watkinson drew a map for the troopers depicting the location of the gun he used to commit the homicides. He again declined contact with his mother. Watkinson was then placed into police custody and transported to trooper headquarters. On the way to headquarters, Watkinson showed the troopers where the gun from the homicides was located. At police headquarters, Watkinson again waived his rights, declined the opportunity to speak with his mother or anyone else, and gave another statement consistent with the first.

Prior to trial, Watkinson filed a motion to suppress his statements to the police, arguing that he did not voluntarily waive his *Miranda* rights. Judge Sanders denied this motion. A jury convicted Watkinson of two counts of murder in the first degree. This appeal followed.

Watkinson argues that he did not knowingly and voluntarily waive his *Miranda* rights. Watkinson contends that he was cold, exhausted from wandering around all night, and that the troopers coerced him by using interrogation tactics which downplayed the importance of his *Miranda* rights. He also argues that his waiver was involuntary because the police did not give him an adequate opportunity to contact his mother and never informed him of the possibility that he faced adult criminal prosecution.

Following an evidentiary hearing, Judge Sanders concluded that Watkinson voluntarily waived his *Miranda* rights. Judge Sanders found that Watkinson was sixteen and one-half years old at the time he talked to the police. He concluded that Watkinson was of above average intelligence, in fact, "quite intelligent." He rejected Watkinson's contention that he was emotionally drained at the time of the interview, and found that Watkinson was "calm and collected." He found that Watkinson had a prior experience with law enforcement officers in which Watkinson made a statement after police read him his *Miranda* rights. Judge Sanders recognized that Watkinson had not been advised that he might be prosecuted as an adult, but the judge stated that this was not dispositive on the issue of voluntariness and was merely one factor to be considered. He found that the troopers conducted the interview in a non-coercive way and did not make any threats, either express or implied, that might make Watkinson's confession involuntary. He found that Principal Conaway had offered Watkinson the opportunity to telephone his mother and that the officers had heard Watkinson decline the opportunity. He found that Watkinson, at the beginning of the second interview, had again waived his right to have his mother notified or present. He

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.  1602, 16 L.Ed.2d 694 (1966).

found that Watkinson did not really want to discuss the matter with his mother. He concluded that Watkinson had voluntarily waived his *Miranda* rights and that Watkinson's statements were admissible.

In *Quick v. State*,[3] the Alaska Supreme Court set out the factors for courts to consider in determining whether a juvenile has voluntarily waived *Miranda* rights:

> The mere fact that a person is under the age of majority does not automatically render him incapable of making a knowing and voluntary waiver. The surrounding circumstances must be considered in each case to determine whether a particular juvenile had sufficient knowledge and maturity to make a reasoned decision. Among the factors to be considered are age, intelligence, length of the questioning, education, prior experience with law enforcement officers, mental state at the time of the waiver, and whether there has been any prior opportunity to consult with a parent, guardian, or attorney.

> It is unquestionably a better practice to see to it that a juvenile consults with an adult before he waives his *Miranda* rights, but, at least in those cases where it has not been requested, we decline to adopt a rule requiring such consultation. The state has always had the burden of proof to show that a waiver was knowing and voluntary. Where a juvenile is concerned, the burden on the state is even heavier than it would be with an adult. We believe that the careful scrutiny to be afforded an unsupervised waiver is sufficient to ensure that the rights of a juvenile suspect will be safeguarded.[4]

Later, in *State v. J.R.N.*,[5] the Alaska Supreme Court concluded that former Alaska Delinquency Rule 7(b) and former AS

47.10.140 required police to offer a juvenile who has been arrested the opportunity to contact a parent. But the Supreme Court also held that the juvenile could waive the right to parental notification as long as the waiver was knowing and voluntary.[6]

■ We have independently reviewed the record. We conclude that Judge Sanders' findings are supported by the record and support his conclusion that Watkinson voluntarily waived his *Miranda* rights. The transcript of Watkinson's statements indicates that the troopers conducted the interview in a non-coercive manner. Watkinson's responses to the trooper's questions during the interview were deliberate and responsive. He was not evasive in telling the troopers what had happened the previous evening. When asked why he decided to tell the truth and how he felt about it, he replied: "Because I figured I was caught anyway, and there is no use in lying anyway." The record supports the conclusion that Watkinson presumed that the evidence against him was overwhelming and that he had nothing to lose by talking to the troopers. We conclude that Judge Sanders did not err in determining that Watkinson's *Miranda* waiver was voluntary.

■ We now turn to specifically address Watkinson's contention that his waiver of rights was involuntary because the police did not inform him that he was exposing himself to adult criminal liability. Watkinson asks us to adopt the minority rule, followed in New Hampshire[7] and South Dakota,[8] which requires such an advisement. Other jurisdictions have, while shunning a *per se* rule, adopted the standard that for juveniles to waive their rights, they must be aware of the possibility of adult criminal prosecution.[9]

3. 599 P.2d 712 (Alaska 1979).

4. *Id.* at 719–20 (footnotes omitted).

5. 861 P.2d 578 (Alaska 1993).

6. *See id.* at 580–81.

7. *See State v. Benoit*, 126 N.H. 6, 490 A.2d 295 (1985), *limited by State v. Dandurant*, 132 N.H. 617, 567 A.2d 592 (1989). In *Dandurant*, the court held that a state statute, providing juveniles previously tried and convicted as adults to be treated as adults for all subsequent offenses, required only standard *Miranda* warnings for such "adult" juveniles, thereby obviating the need for the more specific *Benoit* warnings.

8. *See State v. Lohnes*, 324 N.W.2d 409 (S.D. 1982), *overruled on other grounds by State v. Waff*, 373 N.W.2d 18 (S.D.1985).

9. *See, e.g., State v. Loyd*, 297 Minn. 442, 212 N.W.2d 671, 676–77 (1973); *Quiriconi v. State*, 96 Nev. 766, 616 P.2d 1111, 1114 (1980); *State*

However, this awareness need not stem from a specific warning, but may arise from the adversarial nature of the police interrogation.

In contrast, the overwhelming weight of authority considers the totality of the circumstances rather than focusing on whether the juvenile was made aware of the possibility of being prosecuted as an adult in determining whether there was a voluntary waiver.[10] We see no reason to abandon the totality of the circumstances test for determining whether a waiver is voluntary. This is the test adopted by the Alaska Supreme Court in *Quick v. State*.[11] It may certainly be possible to make a credible argument in another case that a juvenile's *Miranda* waiver was involuntary because, considering the totality of the circumstances, he was unaware that his statement could subject him to prosecution as an adult. However, under the circumstances of Watkinson's case, we fail to see how this was an important factor. Watkinson had just finished planning and carrying out the murder of his father and stepmother. It seems improbable that Watkinson would not be aware that he was confessing to extremely serious crimes and that he faced serious consequences. We therefore reject Watkinson's argument that his waiver of *Miranda* rights was involuntary because he was not informed of the possibility that he faced prosecution as an adult.

■ Watkinson next argues that his sentence is excessive. Watkinson contends that Judge Sanders erred in finding several statutory aggravating factors applied to his offense. However, since Watkinson was not subject to presumptive sentencing, aggravating factors did not control his sentence. Although statutory aggravating and mitigating factors can certainly be useful in helping the parties frame their sentencing arguments, they do not control the sentence which the court can impose.[12] We do not believe that it is necessary for us to review Judge Sanders' findings on the aggravating factors in order to review Watkinson's sentence.

■ In sentencing Watkinson, Judge Sanders fully considered Watkinson's youth as a major factor in Watkinson's favor. Yet, Judge Sanders totally rejected Watkinson's suggestion that his crime was explainable by his father's and stepmother's abuse. He concluded that the facts showed that Watkinson had planned the murders. He found that there was no plausible explanation for the murders other than that Watkinson was angry because his father had divorced his mother and destroyed his original family. He noted that Watkinson had also stated that he was sick and tired of parental guidance and arguing. He stated that Watkinson, who appeared calm and normal, had within him an unexplainable and destructive rage that made him unpredictable and extremely violent. He held that Watkinson needed to be isolated for a 100-year term in order to protect the public from similar behavior.[13]

This court has consistently upheld maximum sentences for first-degree murder where the trial court has made findings sufficient to justify such a sentence.[14] Judge

---

v. *Gullings*, 244 Or. 173, 416 P.2d 311, 313–14 (1966); *State v. Luoma*, 88 Wash.2d 28, 558 P.2d 756, 761 (1977).

**10.** *See, e.g., Matter of Appeal in Pinal County, Juvenile Action No. J–677*, 134 Ariz. 502, 657 P.2d 915, 916 (App.1982); *State v. Perez*, 218 Conn. 714, 591 A.2d 119, 125 (1991); *People v. Prude*, 66 Ill.2d 470, 6 Ill.Dec. 689, 363 N.E.2d 371, 373 (1977); *State v. O'Connor*, 346 N.W.2d 8, 10 (Iowa 1984); *Edwards v. State*, 227 Kan. 723, 608 P.2d 1006, 1009–10 (1980); *State v. Perry*, 954 S.W.2d 554, 562–63 (Mo.Ct.App.1997); *State v. Taylor*, 128 N.C.App. 394, 496 S.E.2d 811, 816 (1998); *Harris v. Commonwealth*, 217 Va. 715, 232 S.E.2d 751, 755 (1977); *State v. Manns*, 174 W.Va. 793, 329 S.E.2d 865, 870 (1985).

**11.** *See Quick*, 599 P.2d at 719–20.

**12.** *See Gregory v. State*, 689 P.2d 508, 509 (Alaska App.1984).

**13.** *See Mutschler v. State*, 560 P.2d 377, 380–81 (Alaska 1977) (citing *Cleary v. State*, 548 P.2d 952, 956 (Alaska 1976)) (to sentence a defendant to a consecutive sentence in excess of the maximum term for his most serious offense, the court must find that it is necessary to impose such a sentence in order to ensure protection of the public).

**14.** *See Sakeagak v. State*, 952 P.2d 278, 285 (Alaska App.1998); *Riley v. State*, 720 P.2d 951, 952–53 (Alaska App.1986).

Sanders' findings, which are supported by the record, establish that Watkinson committed a premeditated and particularly brutal murder of his father and stepmother. His findings support his conclusion that Watkinson is a particularly dangerous and unpredictable offender who needs to be isolated for the 100–year term of imprisonment. We conclude that the sentence which he imposed is not clearly mistaken.[15]

The conviction and sentence are AFFIRMED.

**15.** *See McClain v. State,* 519 P.2d 811, 813–14     (Alaska 1974).